2015 IL App (1st) 123470
No. 1-12-3470

Fifth Division
September 11, 2015

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | On Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 94 CR 11503 |
| v. | ) ) | |
| | ) | The Honorable Lawrence Flood, |
| SEAN TYLER, | ) | Judge Presiding. |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) ) | |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Sean Tyler, an 18-year-old[1] with no prior criminal record, was convicted of first-degree murder following a jury trial on October 27, 1995. The only evidence at trial implicating defendant in the murder was the testimony of a witness who testified that she observed defendant run through an alley carrying a gun shortly after the shooting and defendant's confession that he acted as a lookout for the shooter; however,

_____

[1] Defendant was 17 years old at the time of the crime but he was tried as an adult.

defendant testified at trial that a detective physically beat him into giving a false confession. After considering factors in aggravation and mitigation, the trial court sentenced defendant to 58 years in the Illinois Department of Corrections (IDOC). On direct appeal, we affirmed defendant's conviction but remanded for resentencing (*People v. Tyler,* No. 1-95-4177 (1998) (unpublished order under Supreme Court Rule 23)), and on remand, the trial court resentenced defendant to 50 years in the IDOC, which we then affirmed in a second appeal (*People v. Tyler,* No. 1-99-1218 (2001) (unpublished order under Supreme Court Rule 23)).

¶ 2     On October 22, 1998, defendant filed a petition for postconviction relief, which later advanced to the second stage. Defendant filed an amended petition on September 16, 2008, raising multiple claims including due process violations, ineffective assistance of counsel, and a claim of actual innocence. The trial court dismissed five of defendant's claims through a partial grant of the State's motion to dismiss on October 15, 2009, and dismissed the remaining claims following a third-stage evidentiary hearing on October 25, 2012.

¶ 3     Defendant now appeals the dismissal of his postconviction petition and raises seven issues: (1) whether defendant is entitled to a third-stage evidentiary hearing on his alleged coerced confession claim; (2) whether witness Andrea Murray's testimony at defendant's prior evidentiary hearing demonstrates his actual innocence and warrants a new trial; (3) whether defendant is entitled to a third-stage evidentiary hearing on his claim that there was a *Brady* violation where the State failed to disclose a pattern and practice of police misconduct; (4) whether defendant is entitled to a new trial on his claim that there was a *Brady* violation where the State failed to disclose that it paid Andrea

Murray money; (5) whether defendant is entitled to a third-stage evidentiary hearing on his ineffective assistance of counsel claim; (6) whether defendant is entitled to a third-stage evidentiary hearing on his claim that the lineup was unduly suggestive; and (7) whether defendant is entitled to relief on a cumulative error basis.

¶ 4    For the following reasons, we reverse and remand for the limited purpose of requiring the trial court to conduct a third-stage evidentiary hearing on defendant's coerced confession claim, and we affirm the dismissal of all of defendant's other claims.

¶ 5                                        BACKGROUND

¶ 6    On March 29, 1994, 10-year-old Rodney Collins was shot and killed outside his home on Winchester Avenue in Chicago. Defendant and codefendants Michael Taylor, Andrew Ganaway, Reginald Henderson (defendant's brother), and Antoine Ward were charged with Collins' murder. Ganaway later pleaded guilty, and Henderson and Ward were found guilty in a separate trial. Defendant was tried in a joint trial with codefendant Taylor. Defendant had a jury trial and Taylor had a bench trial.

¶ 7                           I. Defendant's Motion to Suppress

¶ 8    On December 2, 1994, defendant filed a pretrial motion to suppress his written confession. In his motion, defendant stated that, subsequent to his arrest on April 1, 1994, he was interrogated at the Area One police station by an assistant State's Attorney (ASA), Chicago Police Detectives William Moser, William Foley, and Graff.[2] Defendant claimed that, prior to his interrogation, he was not informed of his *Miranda* rights. He further argued that, "due to physical coercion," including beatings to his chest administered by Moser, he was unable to appreciate and understand the full meaning of

_____

[2] Detective Graff's first name does not appear in the appellate record.

3

his *Miranda* rights, and therefore, his statements were not voluntarily, knowingly, and intelligently made. As a result, defendant argued that all communications, confessions, statements, admissions, gestures, or tests made by him at the time of, and subsequent to, being taken into custody were involuntary in violation of the fifth and fourteenth amendments of the United States Constitution and must be suppressed as evidence.

¶ 9    Although the transcript of the suppression hearing does not appear in the appellate record, the Rule 23 order on defendant's direct appeal summarized the proceedings:

> "At the hearing on the motion, Chicago police officer William Foley testified that he spoke with defendant at the police station on April 1, 1994, at about 1:30 p.m. Foley read Tyler *Miranda* rights. Tyler said he understood them. Foley and his partner, Detective Michael Clancy, spoke with Tyler for about five minutes. No one threatened or struck Tyler while Foley was in the room.
>
> Detective Robert Lenihan testified that on April 1, 1994, at about 5:30 p.m., he interviewed Tyler. After giving Tyler *Miranda* warnings, Lenihan spoke with Tyler for about 45 minutes. Lenihan was also present when [an] assistant State's Attorney *** questioned Tyler at 8 p.m. [The ASA] again advised Tyler of his *Miranda* rights and interviewed him for 30 minutes. No one threatened or hit defendant during the interviews.
>
> Detective William Mosher[3] testified that on April 1, 1994, at about 8:45 p.m., he interviewed Tyler for about 20 minutes. Tyler was not handcuffed. Mosher interviewed Tyler again at about 11 p.m. with [an

---

[3] In the Rule 23 order, and in various other places in the appellate record, Detective Moser's last name is spelled "Mosher."

ASA]. Before both interviews, Tyler was given *Miranda* warnings. After the second interview, Mosher went with his partner and [the ASA] to the scene of the crime. Mosher and [the ASA] again interviewed defendant at 1:30 a.m. on April 2, 1994. Defendant then signed a handwritten statement. Part of the statement indicated that '[Tyler] had been treated well by the police *** while in the police station.' Polaroid photos were taken of Tyler after he signed the statement.

After the State rested, Theresa Bonner, Tyler's cousin, testified on behalf of Tyler. On April 2, 1994, around midnight, she went with a former boyfriend and Tyler's brother to see Tyler at the police station. Bonner noticed that the left side of Tyler's face was swollen, but saw no bruises. Tyler told her that 'the police had beaten him and forced him to sign papers.' When shown the Polaroid photo of Tyler, Bonner said Tyler's face looked swollen in the picture.

In rebuttal, the State presented a stipulation that, if called to testify, police officer Haskins would have said that on April 2, 1994, he was the lock-up keeper when Bonner and her former boyfriend signed in to visit Tyler. Tyler's brother was not present. While Tyler was in lock-up, Haskins asked Tyler if he was taking medication. Defendant said he was taking medication for asthma. Haskins saw no signs of pain or injury. Tyler did not say that he had been beaten or struck by the police. At 11:05 a.m., Tyler was taken out of lock-up to go to the hospital, but he refused to go. At 12:10 p.m., he was taken to the hospital.

The parties also stipulated that Dr. Bruce Tizes would testify that he was working at Chicago Osteopathic Hospital on April 2, 1994. He treated Tyler for vomiting and saw no signs of trauma. Tyler said nothing about being mistreated by the police." *People v. Tyler,* No. 1-95-4177 (1998) (unpublished order under Supreme Court Rule 23).

¶ 10    The trial court denied defendant's motion to suppress. Defendant did not testify in the motion to suppress but he did testify at his trial that Detective Clancy did beat him on the chest and slapped him in his face.

¶ 11                                    II. Trial

¶ 12    At trial, the State presented 11 witnesses, including Andrea Murray; an ASA; Detectives James O'Brien, Robert Lenihan, and William Foley; and 5 rebuttal witnesses, including Dr. Bruce Tizes and Detective William Moser. The defense called four witnesses, including defendant, his cousin Teresa Bonner, and Donald Jones, who corroborated defendant's alibi.

¶ 13                          A. Defendant's Written Statement

¶ 14    Defendant's alleged confession was made in writing and admitted into evidence without objection. In his written statement, defendant stated that he is 17 years old, goes by the nickname "Droopy," and is a member of the Gangster Disciples street gang. On March 29, 1994, he ran into other members of the Gangster Disciples: Michael Taylor (nicknamed "MT"); Antoine Ward ("Twan" or "Twon"); Kenneth McGraw ("Yogi"); Travis Ashby ("Stank"); defendant's brother Reginald Henderson ("Bullwinkle"); and Carl and Drew, whose last names defendant did not know.

¶ 15    Defendant stated that Carl, the chief of security for the Gangster Disciples, said that they needed to "take care of business" in the area, which meant to "shoot some Black Stones," who were members of a rival gang. Carl handed defendant a .380 semiautomatic pistol and told him to shoot any Black Stones coming in his direction. The group then broke up to take their various positions, and defendant stood in a gangway between Wolcott and Winchester Avenues. Soon afterward, defendant heard 18 or 19 shots, which he believed were fired from two different guns, coming from Winchester Avenue. Once he heard the shots, he ran north on Wolcott Avenue and met up with Carl. The two ran east toward Honore Street, through gangways, and in the gangway between Wolcott Avenue and Honore Street, defendant handed the gun back to Carl. Taylor and Drew, who were also carrying guns, met with defendant and Carl in the gangway, and defendant then ran to a store on 51st Street and Wood Street by himself.

¶ 16    Defendant stated that he had shown the ASA that he could read and write by reading the first paragraph of the statement out loud. He also stated that he had been treated well by the police, who had allowed him to use the restroom, drink water, and eat food from McDonald's.

¶ 17                          B. Andrea Murray's Testimony

¶ 18    Andrea Murray testified that, on March 29, 1994, she lived in a second-story apartment on South Wolcott Avenue, which is one block east of Winchester. At approximately 5 p.m., she was at home and heard gunshots. However, she did not observe the shooting. From her back kitchen window, Murray observed two "young guys" running down an alley each with a gun in their hand. She walked to her front window and observed the two split up, both running through different alleys. On April 1,

1994, she identified defendant and codefendant Taylor in a police lineup. She testified that she identified them based on their faces, not their clothing, and that neither was wearing the same clothing in the lineup as they were wearing when she observed them running through the alley with guns. Murray identified defendant and codefendant Taylor in court as the two young men she observed running through the alley.

¶ 19                                    C. Detectives' Testimony

¶ 20     Detective James O'Brien testified that he was assigned to Area One Violent Crimes and that, on March 29, 1994, he and his partner, Jerry Carroll, investigated the shooting of Rodney Collins near 51st Street and Winchester. They arrived at the crime scene at approximately 5:20 p.m. and then conducted field interviews and canvassed the area with Area One Detectives Clancy, Foley, and Halloran. Two days later, on March 31, 1994, Detective O'Brien spoke with Detectives Foley and Clancy, who told Detective O'Brien that they were looking for defendant and codefendant Taylor. Detective O'Brien then met with an eyewitness, Charles Breckenridge, who picked Taylor's photograph out of a photo array. Breckenridge was able to identify only Taylor and did not testify against defendant.

¶ 21     Detective Robert Lenihan testified that, on April 1, 1994, he received a telephone call from defendant and then picked up defendant from a nearby McDonald's at 1 p.m. and drove him to Area One Violent Crimes. Detective Lenihan placed defendant in an interview room on the second floor, where defendant "may have been" handcuffed. Before Detective Lenihan interviewed defendant, Detective Foley, and "possibly" his partner Detective Clancy, spoke to defendant. Detective Lenihan first spoke to defendant at 5:30 p.m. and he read defendant his *Miranda* rights. Detective Lenihan told defendant

that the police had information that he was at the scene of the shooting and that he had been identified in a lineup. During his 45-minute conversation with Detective Lenihan, defendant confessed to his role as "security" in the shooting.

¶ 22    Detective William Foley testified that, on March 30, 1994, he interviewed Kenneth McGraw and Antoine Ward concerning the shooting death of Collins. Afterwards, Detective Foley told Detective O'Brien that he was looking for defendant and codefendant Taylor. On April 1, 1994, Detective Foley met with Detective Clancy and defendant at 1 p.m., prior to defendant's lineup, and the detectives received some "general information" from defendant. Following the lineup, at 3:30 p.m., the detectives spoke with defendant again for 10 minutes. Detective Foley also interviewed defendant's brother, Reginald Henderson, on that day.

¶ 23                    D. ASA's Testimony

¶ 24    An ASA testified that, on April 1, 1994, she arrived at Area One Violent Crimes at 10 p.m. and met defendant in an interview room with Detective Moser. She did not observe any markings on defendant's face. She then spoke with defendant, with Detective Moser present, at 11 p.m. for approximately half an hour and defendant answered her questions and drew a map of the crime scene for her. Following the interview, the ASA drove to the crime scene on South Winchester. When she arrived back at the police station at 12:30 a.m., she spoke with defendant alone. She asked defendant about his treatment by the police and he told her that he had been treated fairly. Defendant chose to have a handwritten statement prepared and he read through the statement with the ASA before he signed it.

¶ 25    After the State rested, the trial court denied the State's motion for a directed verdict.

¶ 26                    E. Defendant's Testimony

¶ 27    Defendant testified that, at 3 p.m. on March 29, 1994, he was playing video games with two friends that he knew only by the nicknames "Poochie" and "Binky" in the home of Donald Trell. Later on, defendant, Poochie, and Blinky went to the home of one of Trell's friends near 57th Street and Indiana Avenue, then went to the Garfield Mall on 55th Street and Wentworth Avenue, and then stopped at a gas station on 47th Street and Damen Avenue. After they left the gas station, they drove up Winchester Avenue and noticed the police vehicles and ambulances near the crime scene.

¶ 28    Defendant testified that, on April 1, 1994, he went to a McDonald's on 51st Street and Wentworth to call the police because his mother told him that a detective handed her his business card and said he needed to speak with defendant. Detectives picked up defendant and took him to the police station across the street, where they questioned him and had him stand in a lineup. Defendant spoke with Detective Lenihan once before the lineup and defendant provided some general information, but he told Lenihan that he had no knowledge of the shooting. Following the lineup, defendant spoke with police officers again, and once more he told them that he was not involved in the shooting. On both occasions, defendant provided an alibi. After a second lineup, defendant spoke with Detectives Foley and Moser, who told him that a witness identified him in the lineup. The detectives then "got aggressive," and one detective hit his chest several times and slapped his face two or three times, hitting him in the eye. Defendant did not identify which detective struck him in the chest but he identified Detective Clancy as the detective that

repeatedly hit him in the face. One of the detectives showed defendant the statement of his brother, Reginald Henderson.[4] After defendant read the statement, he became scared and asked the detective, "What else do you want me to do?" Defendant later spoke with the ASA while Detective Moser was standing at the door, and he was still afraid during the conversation.

¶ 29    Defendant testified that, later that day after he signed the statement, he was transported to Chicago Osteopathic Hospital because his chest hurt and he was vomiting blood.

¶ 30                              F. Other Defense Witnesses

¶ 31    Donald Latrell "Trell" Jones testified that he was friends with defendant and that, at 3 p.m. on March 29, 1994, defendant was with him at his house playing video games with "Poochie" and "Blinky." Later, they left the house and went to 51st Street and Indiana, where Jones received $5 from his cousin Reese. They then went to a telephone company because Poochie had to pay his girlfriend Shereen's telephone bill, and from there they stopped at a gas station at 47th Street and Damen Avenue. From there, they went toward Winchester Avenue where they observed the crime scene. They left the scene and dropped defendant off at a store on 51st Street and Woods. Jones admitted that, even though he later learned that defendant had been charged with Collins' murder, he never told the police of his version of the events.

¶ 32    Defendant's cousin, Teresa Bonner, testified that she visited defendant at the police station at 11:50 p.m. on April 2, 1994, and that she observed his face was swollen

---

[4] Henderson's statement is not in the record; however, Henderson testified at his own trial that his confession was coerced over a period of three days during which he was physically abused and not provided food or water.

at the time. Evie Tyler, defendant's mother, testified that she gave defendant a card that a detective had left with her and she told him to contact the detective. She did not meet with her son again until April 3, 1994.

¶ 33     After the defense rested, the State called several rebuttal witnesses.

¶ 34                              G. Rebuttal Testimony

¶ 35     Rebuttal witness Dr. Bruce Tizes testified solely from his medical records that, on the evening of April 2, 1994, he administered defendant medical treatment in the Chicago Osteopathic Hospital's emergency room. After reviewing defendant's emergency medical records recorded by the intake staff, Dr. Tizes recorded that defendant had a history of hematemesis, "which means a history of vomiting blood." The contents of defendant's stomach had been examined but there was "no objective sign of blood at the moment." No diagnostic tests were performed to determine whether there was blood in the stomach. Defendant did not complain of any police abuse and Dr. Tizes did not observe any redness or bruising on defendant's face or chest. On cross-examination, Dr. Tizes admitted that he did not have an independent recollection of his care and treatment of defendant.

¶ 36     Officer Thomas Williams testified that he was assigned to transport defendant to the hospital at 11 a.m. on April 2, 1994, but defendant refused to go at the time. Williams was called back an hour later at 12:05 p.m. and this time defendant agreed to go to the hospital.

¶ 37     Detective Lenihan testified that he had a conversation with defendant at the Area One police station on April 1, 1994, and that defendant told him he was at an address on South Winchester at the time of the murder and never mentioned Jones or Poochie.

¶ 38     Detective William Moser testified that he interviewed defendant at 8:45 p.m. on April 1, 1994. Moser did not strike defendant during the interview, nor did Detective Clancy strike defendant. Defendant never told Moser that he was in a vehicle at the time of the crime, and he never mentioned Jones, Poochie, or Binky.

¶ 39                                H. Verdict

¶ 40     On September 27, 1995, the jury found defendant guilty of first-degree murder. After hearing factors in aggravation and mitigation, the trial court sentenced defendant to 58 years in the IDOC on October 27, 1995.

¶ 41                              III. Direct Appeal

¶ 42     On direct appeal, defendant argued that: (1) the trial court erred in denying his motion to suppress his confession; and (2) the trial court abused its discretion when it failed to accord weight to his rehabilitative potential and imposed a sentence "grossly disparate" to that of codefendant Ganaway, who pleaded guilty. On June 24, 1998, we affirmed defendant's conviction but remanded for resentencing. *People v. Tyler,* No. 1-95-4177 (1998) (unpublished order under Supreme Court Rule 23). On remand, the trial court resentenced defendant to 50 years in the IDOC. Defendant appealed the new sentence, which we later affirmed on February 27, 2001. *People v. Tyler,* No. 1-99-1218 (2001) (unpublished order under Supreme Court Rule 23).

¶ 43                    IV. Postconviction Proceedings

¶ 44     On October 22, 1998, defendant filed a *pro se* postconviction petition pursuant to section 122-2.1 of the Post-Conviction Hearing Act (the Act). 725 ILCS 5/122-2.1 (West 1996). The trial court dismissed the petition May 3, 1999, beyond the 90-day period within which the trial court must act. 725 ILCS 5/122-2.1 (West 1996). Defendant

13

appealed, and we remanded the petition for second-stage proceedings on February 13, 2002. *People v. Tyler,* No. 1-99-2334 (2002) (unpublished order under Supreme Court Rule 23).

¶ 45                    A. Amended Postconviction Petition

¶ 46    On September 16, 2008, after a long series of continuances and discovery requests, the trial court granted defendant leave to file an amended petition, which he then filed on December 17, 2008. The amended postconviction petition raised eight issues.

¶ 47    First, defendant claimed actual innocence based on the recanted testimony of Andrea Murray, new affidavits of alibi witnesses, new medical testimony showing defendant was beaten, and new evidence of police misconduct. Second, he claimed that police physically coerced his confession in violation of his fourth amendment rights. Third, he argued that the State committed a *Brady* violation when it failed to disclose evidence of a pattern and practice of police misconduct. Fourth, defendant argued that the State committed a *Brady* violation when it failed to disclose that it paid for witness Murray's moving expenses. Fifth, defendant claimed that the police used impermissibly suggestive techniques in the lineup in which Murray identified him, in violation of his fourth amendment right to due process. Sixth, defendant argued that he received ineffective assistance of trial counsel, in violation of his sixth amendment right to counsel, because his attorney failed to investigate his alibi or corroborate his allegations of abuse. Seventh, he argued that, to the extent that any claims asserted in his petition were deemed waived for failure to present them previously, he received ineffective

assistance of appellate counsel. Lastly, defendant requested postconviction relief based on the cumulative effect of the errors alleged within his petition.

¶ 48    Defendant's actual innocence claim relied on four pieces of newly-discovered evidence: (1) the affidavit of Andrea Murray, recanting her trial testimony; (2) the affidavits of George Mosley and Steven Alexander, corroborating defendant's alibi at trial; (3) the report of an expert witness, Dr. Fiona Gallahue, concerning defendant's hematemesis diagnosis; and (4) a collection of evidence of police misconduct, including 90 exhibits containing affidavits, complaints, newspaper articles, and other cases in which other defendants alleged abuse by Detectives Kenneth Boudreau, James O'Brien, John Halloran, Michael Clancy, William Foley, and William Moser. Defendant also attached the affidavit of Julie Hull, who testified to the connection between defendant's case and M.W.'s criminal case and civil lawsuit (*Wiggins v. Burge,* 173 F.R.D. 226 (N.D. Ill. 1997)).

¶ 49                    1. Affidavit of Andrea Murray

¶ 50    Attached to defendant's petition was the affidavit of Andrea Murray, who was a witness for the State in defendant's jury trial. The affidavit consists of 23 typewritten paragraphs, including 7 handwritten corrections with the initials "A.M." In one such correction, Murray corrected the sentence that said, "I testified falsely at trial that I saw Sean Tyler outside a gangway near my house on March 29, 2004," by changing the year 2004 to 1994, and placed her initials averring the change in between the words "testified" and "falsely." The affidavit was signed by Andrea Murray on June 13, 2007, and notarized by Elizabeth Cotter; however, Cotter was not present when Murray signed the affidavit.

¶ 51    In her affidavit, Murray averred that, on March 29, 1994, she called the police after she heard gunshots and observed two boys, at least one of whom was carrying a gun, run through the gangway near her house. Detectives and uniformed officers showed up at her house and "were very aggressive and intimidating."

¶ 52    Murray averred that, a few days later, a detective called and told her that two of the offenders were in custody and they needed her to pick them out of a lineup. She was "uncomfortable" at the police station because she was scared of being called a "snitch" in her neighborhood and she was concerned that she did not have a good enough look at the two boys to identify them. She told the detectives this, but they intimidated and threatened her. The detectives led her into a room, showed her photographs of defendant and codefendant Taylor, and told her that she needed to pick them out of the lineup. During the lineup, she quickly identified defendant from his picture, and the detectives told her " 'that's right' or 'good job' or something to that effect." Had it not been for the detectives, she would not have been able to pick anyone out of the lineup. She averred that she remembered speaking to Detective O'Brien on the day of the lineup.

¶ 53    Murray averred that she became scared when she was later told that she needed to testify, but the detectives suggested that she did not have a choice. Since she was frightened, the State's Attorney offered to pay for her to move her place of residence to another location, her first month's rent, and security deposit. The State's Attorney said, "It was either that or [she] could fend for [her]self." She averred that, even though she knew that her testimony would be false, she felt that she had no choice. At some point during her "many meetings" with detectives, Detective O'Brien told her that the two boys she

identified were "troublemakers" and "he was going to make sure they did not get away this time."

¶ 54    Murray averred that she testified falsely at defendant's trial that she observed defendant in the gangway near her house on March 29, 1994, and that she testified falsely because of "intense pressure" from the police. As far as she knew, defendant had absolutely nothing to do with the crime. She averred that, after testifying, she was moved to a house on 82nd Street and Loomis Boulevard, and that the State paid her "moving expenses, *** security deposit and *** first month's rent." She never felt comfortable in that house because she thought it was "dirty money" and that her testimony was "bought."

¶ 55    Murray identified James O'Brien, John Halloran, and Kenneth Boudreau as the detectives whom she spoke with during the investigation and prior to trial. She also spoke with an assistant State's Attorney.

¶ 56                    2. Affidavits of Alibi Witnesses

¶ 57    In his postconviction petition, defendant averred that he had new evidence to corroborate his alibi at trial, which was that, on the date of the murder, he was playing video games with Donald Jones, "Poochie," and "Binky." Donald Jones testified at defendant's trial as a defense witness; however, defendant stated that, at the time of trial, he did not know Poochie's and Binky's real names. Poochie and Binky were later identified as George Mosley and Steven Alexander. Thus, defendant asserts, the affidavits of Mosley and Alexander are "newly discovered." Although the affidavits are listed as exhibits to the postconviction petition, they are not in the appellate record.

¶ 58                    3. Dr. Gallahue's Affidavit

¶ 59    In his postconviction petition, defendant emphasizes additional new evidence in the form of a report of an expert witness, Dr. Fiona Gallahue, who opined that hematemesis is consistent with defendant's allegation of being beaten on his chest, and that one etiology for acquiring hematemesis is through an intramural esophageal hematoma. However, although the affidavit is an exhibit to the postconviction petition, it is not in the appellate record.

¶ 60                4. Evidence of a Pattern of Police Abuse and Misconduct

¶ 61    Defendant attached 90 exhibits containing numerous affidavits, complaints, and parts of cases and appellate decisions concerning other defendants, including codefendants, who alleged abuse by Detectives Michael Clancy, William Moser, and other officers. The claims are voluminous; however, we will highlight those that concern Detectives Clancy and Moser.

¶ 62    The following list shows complaints of physical beatings or psychological coercion by Detectives William Moser and Michael Clancy:

Misconduct Complaints of Physical Beating

Detective William Moser
1976 – Michael Evans (psychological coercion)
1976 – Paul Terry (psychological coercion)
1980 – William Simpson
1990 – Eric Johnson
1990 – Demond Weston
1991 – Sandy Curtis
1992 – Harold Hill, Dan Young, and Peter Williams
1992 – Anthony Williams
1993 – Otha Anderson
1993 – Emmett White
1993 – Anthony Tellis
1994 – Alejandro Ruvalcaba (psychological coercion)
1994 – Michael Taylor

> 1994 – Sean Tyler
> 1996 – Dwayne Macklin
>
> Detective Michael Clancy
> 1992 – John Plummer
> 1993 – Tyrone Hood (related to King)
> 1993 – Terry King (related to Hood)
> 1993 – Anthony Tellis (with Detective Moser)
> 1993 – Emmitt White (with Detective Moser)
> 1994 – Reginald Henderson (with Detective Moser)
> 1994 – Michael Taylor (with Detective Moser)
> 1994 – Sean Tyler (with Detective Moser)
> 1994 – Antoine Ward

We note there are 13 cases under protective order involving the group of named officers that we do not have access to.

¶ 63    In 1976, defendants Michael Evans and Paul Terry claimed that Detective Moser and two other police officers fabricated evidence, manipulated witnesses, and caused Evans psychological coercion in giving false confessions. The defendants' cases and crimes were not related.

¶ 64    Evans spent 27 years incarcerated for a murder and rape that he did not commit. DNA evidence later exonerated him for the crime. In a lawsuit filed in federal court, Evans v. City of Chicago, No. 04 CV 03570 (N.D. Ill.), it is alleged that Moser and other officers fabricated and manufactured evidence manipulating multiple witnesses to falsely implicate Evans, and used physical violence and psychological intimidation to coerce Evans to falsely confess to a crime he did not commit. This lawsuit is attached to the postconviction petition in the case at bar.

¶ 65    In 1992, defendant Harold Hill, age 16, claimed that Moser and six other policemen physically abused him, threatened codefendants, and fabricated incriminating statements and attributed them to witnesses who never made those statements. Hill

19

claimed that his confession had been coerced by police brutality and he was wrongfully convicted of rape and murder. After serving 12 years of a life sentence, Hill was exonerated through DNA evidence, all charges were dropped, and he was ultimately released from prison. He filed a lawsuit against Moser and others. Hill v. City Of Chicago, No. 06 CV 06772 (N.D. Ill.). All of this information is found in the federal lawsuit attached to the postconviction petition. In addition, Dan Young and Peter Williams also claimed that they were beaten by Moser into giving false statements. Young, who had an I.Q. of 56, claimed he was kicked and struck and ultimately also confessed to the rape and murder. Williams claimed he was chained to a radiator and forced to urinate on himself and struck with a blackjack, and he also confessed but was not charged because he was in prison for another offense at the time of the offense.

¶ 66    In 1980, defendant William Simpson claimed that he was slapped, strip searched, had his eyeglasses broken, and threatened that he would remain handcuffed to the wall until he was ready to cooperate by Moser and another police officer. Apparently, Simpson had been on drugs and needed medical attention from withdrawal symptoms but Moser and another officer interrogated him almost continuously "from 10:30 a.m. to dawn," and Simpson claimed Moser physically abused him until he confessed to the murder of the victim. All of this information is contained in the case of *Simpson v. Neal*, 746 F. Supp. 780 (N.D. Ill. 1990), and is attached to the postconviction petition in the case at bar.

¶ 67    In 1990, defendant Eric Johnson claimed that Moser and three other police officers struck him on the face, knocked him to the ground, and kicked him in the stomach, chest, and face causing him to give a false confession. Following a jury trial,

20

Johnson was convicted of two counts of first-degree murder and attempted armed robbery based on accountability, and sentenced to life imprisonment for the 2 murders and 10 years for attempted armed robbery. The complaint of abuse was closed by the Office of Professional Standards (OPS), which found no substantiation of police brutality or physical abuse. Its report is attached to the postconviction petition here.

¶ 68    In 1990, Demond Weston claimed that Moser and two other officers slapped and physically beat and psychologically coerced him into a confession. An OPS file memo attached to the postconviction petition reveals that Weston was 17 years old when he was convicted of first-degree murder and attempted first-degree murder and sentenced to 45 years in the IDOC. The evidence in the case was overwhelming; however, Weston alleged that Detective Moser, with two other officers, physically abused him while being interrogated. Moser is reported to have slapped him approximately 10 times. Weston never received any medical attention and his only proof of injury was his testimony. He filed a postconviction petition that he confessed as a result of the beating and promises that he could go free if he told the police what they wanted to hear. Weston's affidavit and statement are also attached to the postconviction petition here.

¶ 69    In 1992, defendant John Plummer was 15 years old and claimed that Detective Clancy, together with Detective William Foley, hit him in the face, stomach, and side with a flashlight; pulled his hair; and held him for interrogation for 30 hours without food until he confessed. His affidavit is attached to this postconviction petition. In Plummer's case, there were photos of his injuries. The statement of Investigator Veronica J. Tillman from the Office of Professional Standards disclosed an interview with Aaron Johnson, a 28-year veteran of the Juvenile Detention Facility, who was responsible for the

movement of residents. He turned Plummer over to the two officers and when Plummer returned, he observed a lump underneath Plummer's left eye and swelling to the left side of his forehead. Plummer was tried as an adult and convicted of first-degree murder and, notwithstanding his claim of police abuse, his confession was found to be voluntary. *People v. Plummer*, 306 Ill. App. 3d 574 (1999).

¶ 70    In 1991, defendant Sandy Curtis claimed Detective Moser and another detective struck him on his face and lower body with their fists. The OPS report attached to the postconviction petition on this case indicates that the complainant refused to cooperate with the investigation and the matter was closed.

¶ 71    In 1993, Lillian White made a complaint to the OPS concerning physical abuse to her son Emmett, age 22, claiming that, during an interrogation, Detective Clancy stepped on the right side of her son's face while he was on the ground and struck him about the face and body. Emmett was arrested for a quadruple homicide and attempted homicide that occurred in Milwaukee, Wisconsin. Since there were no witnesses to support Emmett's claims and no physical evidence, the investigation was closed. The OPS report is attached to the postconviction petition in this case.

¶ 72    In 1993, defendant Tyrone Hood made a complaint to the OPS that Detective Michael Clancy struck him about the body, stepped on his neck and penis, put a gun to his mouth, and searched his house without a warrant or his consent. Also, codefendant Terry King, age 20, complained that Clancy struck him in the head and body with his fists, put a gun in his mouth, and arrested him without probable cause. Three other officers were also mentioned as participants. The complaints were initially made by the defendants' mothers. Both defendants were suspects in a murder investigation. King was

ultimately cleared, but charges were brought against Hood. King later filed a civil suit in federal court against Detective Clancy and others for false arrest and excessive force. The OPS report is attached to the postconviction petition in this case.

¶ 73    In 1992, Anthony Williams, age 17, claimed that he was beaten by Detective William Moser and four other police officers into confessing to first-degree murder and armed robbery. The trial court found that his confession was voluntary and under the totality of the circumstances, the appellate court found that the trial court's finding was not against the manifest weight of the evidence. *People v. Williams*, 303 Ill. App. 3d 33 (1999). The appellate court decision is attached to the postconviction petition in the case at bar.

¶ 74    In 1993, defendant Otha Anderson claimed that Detective William Moser and other police officers knowingly withheld exculpatory information, physically beat him and provided a suggestive lineup causing his conviction and a life sentence. This information was obtained from a civil lawsuit in the Eastern Division of the United States District Court for the Northern District of Illinois, Anderson v. Devine, No. 06 CV 06954 (N.D. Ill.). The complaint is attached to the postconviction petition in the case at bar.

¶ 75    In 1994, defendant Alejandro Ruvalcaba, age 16, was a suspect in a murder investigation and confessed to the crime after Detective Moser showed him a picture of Ruvalcaba's girlfriend, Diana Caguana, and their baby, and told him to confess or Moser would "get Caguana and get the truth out of her, and if she tried lying [Moser] would make sure he put her in jail and [would] take the baby, and make sure the baby ended up in D.C.F.S." This information is contained in the appellate decision from the United

States Court of Appeals, Seventh Circuit, *Ruvalcaba v. Chandler*, 416 F. 3d 555 (7th Cir. 2005), attached to this postconviction petition.

¶ 76    In 1994, defendant Antoine Ward claimed that Detective Michael Clancy stepped on his left hand; struck him in the head; refused to allow him to use the bathroom, causing him to urinate in a desk drawer; and interrogated him for 48 hours. Ward gave an incriminating statement, which the trial court found to be voluntarily made, and he was convicted for murder under the accountability theory and his case was affirmed on appeal. All of this information was obtained from the decision on appeal, which is attached to the postconviction petition in the case at bar. *People v. Ward*, 302 Ill. App. 3d 550 (1998).

¶ 77    In the case at bar, defendant Reginald Henderson is a codefendant and defendant's brother. In his testimony for his motion to suppress statements, which is attached to the postconviction petition in this case, he testified that either Detective Clancy or Moser grabbed him by the throat, slapped his ears and face, denied his plea for an attorney, and interrogated him for 30 hours until he gave them the statement that they wanted. The report of proceedings to his case is attached to the postconviction petition in the case at bar.

¶ 78    In the case at bar, defendant Michael Taylor was a codefendant who chose a bench trial. He claimed that Detectives Clancy and Moser kicked him in the groin, punched him in the head, handcuffed him to a coat rack, never read him the *Miranda* rights, denied him access to an attorney, and caused him to give them the statement they wanted to stop the punishment. The information is contained in Michael Taylor's affidavit, which is attached to the postconviction petition in this case.

¶ 79          5. Affidavit of Julie Hull and M.W.'s Civil Lawsuit

¶ 80    Also attached to defendant's postconviction petition was the affidavit of Julie Hull, a Cook County assistant public defender. She stated that she represented defendant in the appeal of his murder conviction. She first met defendant in 1992, when he served as an eyewitness and exculpated her client, "M.W.," who was charged in a delinquency petition for the murder of Alfredo Hernandez. Hull averred that the relationship between defendant's murder case and M.W.'s case was "amply apparent" and she detailed the relationship chronologically.

¶ 81    Hull averred that M.W. was given electrical shock treatments to force him into signing a confession by detectives at Area Three Violent Crimes on 39th Street and California Avenue. Area Three's commander, Jon Burge, was terminated from the police department for torturing suspects. M.W.'s allegations that shock-torture was used to obtain his confession was reported in a Chicago Sun-Times front-page story under the headline "3 Teens Say Police Used Shock Torture." Deborah Nelson, *3 Teens Say Police Used Shock Torture*, Chicago Sun-Times, July 19, 1992, at 1.

¶ 82    Hull averred that, through M.W.'s mother, she learned that defendant had information on the Hernandez murder; however, defendant was afraid to testify because M.W. and Myron James[5] both told him about beating and shock treatments that occurred at Area Three. Defendant agreed to testify only after Hull assured him that she would keep his identity secret by "burying" his name in the witness list. Hull told the trial court that defendant's testimony would exculpate her client and four other defendants. She was ordered to provide defendant's name and address, but before she provided this

---

[5] The affidavit does not provide any more details on the identity of Myron James.

information, she obtained a protective order against defendant, which prevented police officers involved in that case from contacting defendant.

¶ 83    Hull averred that, on July 30, 1992, the trial court granted M.W.'s motion to suppress his statement as involuntary; however, the decision was later reversed on appeal. On August 1, 1992, the Chicago Sun-Times reported on the trial court's decision to suppress M.W.'s statements as involuntary. Following the article, Amnesty International contacted Hull about M.W.'s case and another case where a 14-year-old allegedly had his genitals shocked while under interrogation at Area Three Violent Crimes. On January 24, 1993, the Chicago Tribune reported on a lawsuit that M.W. filed against the city of Chicago; Sergeants Byrne and Bonke; Detectives O'Brien, Maslanka, Paladino, Boudreau and Kill; former Area Three Commander Jon Burge; and former Superintendent LeRoy Martin. Both articles concerning M.W.'s case are included in the record.

¶ 84    Hull averred that she met with defendant at the county jail in 1994 following his arrest, indictment, and arraignment in the present case. She asked defendant why he had made statements to the police and why he had not called her first. He stated that his mother had told him that the police wanted to ask him some questions and that he had nothing to worry about "since he had nothing to hide" because he was with friends playing video games at the time of Collins' murder. Defendant told Hull that he had made his false confession because he was "plain scared" when the police would not listen to his alibi and "started hitting him." Hull told defendant that she was surprised that being hit a few times would cause him to confess to something that he did not do. Defendant told her that when the detectives showed him his brother, Reginald Henderson's, confession, "he knew he was in for a really hard time" unless he also confessed. Henderson was much

26

older, bigger, and stronger than he was, and defendant thought that the police must have done "some pretty violent things" in order to convince Henderson to confess.

¶ 85    Hull averred that she attempted to communicate this information, which she believed was relevant to defendant's motion to suppress, to the assistant public defender (APD) assigned to his case. However, the APD became "very angry and hostile" and told her "if you want to represent *** him, go ahead. I don't care."

¶ 86    Hull averred that, in December of 1995, the State finally nol-prossed M.W.'s petition for adjudication of wardship.

¶ 87    Hull averred that she was contacted by defendant to represent him on appeal, and she was assigned to his case on March 21, 1996. At that time, she learned that Detective Boudreau, who formerly worked at Area Three Violent Crimes and was a detective in M.W.'s case and a defendant in M.W.'s civil lawsuit, was listed in the arrest report. Further, she learned that Detective O'Brien, who was the lead detective in M.W.'s case and a defendant in M.W.'s lawsuit, testified against defendant at trial. Hull averred that she was "personally aware" at the time that Detectives O'Brien, Boudreau, and Foley had Office of Professional Standards complaints filed against them for use of excessive force, and she had "second hand information" that there were similar complaints against Detective Clancy.

¶ 88    In September 1996, M.W.'s lawsuit was settled "with a significant dollar award." Hull averred that "the M.W. case remains a lightning rod of controversy."

¶ 89    Based on Hull's affidavit, defendant emphasized in his postconviction petition the connection between M.W.'s case and his conviction. Defendant argued that Detectives Boudreau and O'Brien, as well as other detectives at Area One who had transferred there

after Area Three closed, used the Collins murder to "pay back" defendant for exposing their previous conduct and that his arrest, forced confession, and conviction were their means of retaliation.

¶ 90    The complaint and depositions of Detectives Boudreau and O'Brien from M.W.'s civil suit (*Wiggins v. Burge,* 173 F.R.D. 226 (N.D. Ill. 1997)), were also attached to the record. In his deposition, Detective Boudreau testified that he was "one of the detectives who put [defendant] in the penitentiary." He also stated that Detectives Moser, Clancy, Halloran, and O'Brien were involved in defendant's case. In Detective O'Brien's deposition, he stated that he was there for the beginning of investigation of Collins' murder, but was off-duty on the day of the lineup, so he "didn't physically deal with" defendant.

¶ 91                    B. State's Motion to Dismiss

¶ 92    On February 4, 2009, the State filed a motion to dismiss pursuant to section 122-5 of the Act. 725 ILCS 5/122-5 (West 2006). The State argued: (1) that defendant's claim of actual innocence was not freestanding and was improperly used to supplement assertions of constitutional violations, and that defendant's new evidence did not show actual innocence; (2) that much of defendant's evidence, including Dr. Gallahue's report, was not newly discovered; (3) that the evidence of systemic police abuse did not establish that defendant's confession was coerced and that the State did not have a duty to disclose this evidence to defendant; (4) that defendant did not show that his trial counsel did not know that Murray was relocated prior to trial, that counsel failed to investigate defendant's alibi, or that he failed to corroborate defendant's claim of abuse where no such evidence existed; (5) that Murray's trial testimony contradicted defendant's claim

that the lineup procedure was unduly suggestive; (6) that defendant's appellate counsel was not incompetent; and (7) that there was no cumulative error as a result.

¶ 93                                    C. The Trial Court's Order

¶ 94     On October 15, 2009, the trial court granted in part the State's second-stage motion to dismiss. First, the trial court found that defendant's claim that he was actually innocent and his confession was the result of police coercion was barred by the doctrine of *res judicata* because it had been raised on direct appeal. The trial court rejected defendant's evidence of misconduct by Detective O'Brien since he was not present during the lineup, and it rejected evidence of misconduct by Detectives Halloran and Boudreau, "neither of which were involved in this case." The trial court held that the relationships of Detectives O'Brien, Halloran, and Boudreau to Detectives Moser and Clancy are "purely speculative." Further, the trial court held that Dr. Gallahue's affidavit was not new evidence of police coercion, adding that she did perform a direct examination of defendant and that she did not opine that defendant's hematemesis was conclusively the result of police brutality. At the same time, the trial court dismissed, without explanation, defendant's claim of a *Brady* violation based on the State's failure to disclose a "pattern and practice of misconduct."

¶ 95     Second, the trial court found that defendant failed to make the requisite showing of either deficient performance or sufficient prejudice under the two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984), to raise an ineffective assistance of counsel claim based on three alleged deficiencies: (1) that trial counsel failed to present evidence that the State paid for Murray's relocation expenses; (2) that trial counsel failed

29

to call alibi witnesses "Poochie" and "Binky"; and (3) that trial counsel should have corroborated defendant's claim of police misconduct.

¶ 96    The trial court explained that defendant's petition was devoid of any evidence supporting the contention that trial counsel was aware that Murray's relocation expenses were paid for by the State. Further, the trial court found that, had the defense raised the issue of relocation expenses, Murray would have testified that she was relocated because she was in fear for her life, which would have prejudiced defendant's case.

¶ 97    The trial court also noted that defendant did present an alibi witness at trial, "Trell Jones," and that Jones testified that "Poochie" was George Mosley and "Binky" was Steven Alexander. Accordingly, Mosley's and Alexander's affidavits were not new evidence. Further, the trial court noted that the decision to call a particular witness was a matter of trial strategy, and since defendant and Jones both testified at trial to defendant's alibi, additional alibi witnesses would have been cumulative. Given that defendant confessed to the police and a witness identified him in a lineup, the evidence in the case was not closely balanced, and accordingly, the trial court found that additional alibi witnesses would not have affected the outcome of the case and defendant was not prejudiced as a result.

¶ 98    The trial court further found that, since defendant had not uncovered evidence of police coercion in his own case, he could not show that trial counsel was ineffective for failing to investigate these allegations. Further, trial counsel litigated defendant's motion to suppress and presented defendant's allegations of abuse at trial.

¶ 99    Third, the trial court rejected defendant's "free-standing" claim of actual innocence, finding that his constitutional rights were not violated by the State, the police,

or his trial or appellate counsel; that his confession was voluntary; and that his newly discovered evidence "is not evidence at all."

¶ 100   Fourth, the trial court did not address defendant's claim that the lineup was unduly suggestive or his cumulative error claim; however, both were implicitly dismissed, without explanation, when the court did not move the claims forward to the third stage.

¶ 101   However, the trial court advanced two of defendant's claims to the third stage for an evidentiary hearing: (1) whether Andrea Murray recanted her testimony; and (2) whether the State committed a *Brady* violation by failing to disclose that it paid for Murray's relocation expenses.

¶ 102                    D. Evidentiary Hearing

¶ 103   On April 27, 2012, the trial court held a third-stage evidentiary hearing, and the defense presented two witnesses: the assistant public defender (APD) and Mort Smith, defendant's private investigator. The defense also sought to call Assistant Public Defender Julie Hull to testify; however, the trial court found that her testimony was collateral. Andrea Murray was deposed and her deposition was admitted into evidence.

¶ 104                1. Andrea Murray's Videotaped Evidence Deposition

¶ 105   On April 22, 2011, the State moved to take Murray's evidence deposition. The State explained at a hearing on the motion on the same date that Murray met with the assistant State's Attorney and stated that she lives with her children and grandchildren and that she was concerned about coming into court. The defense disputed that Murray was in any danger from defendant, his family, or the defense; however, on April 27, 2011, the defense agreed that an evidence deposition was in the best interest of Murray, and the court accordingly granted the State's motion.

31

¶ 106   Murray was initially uncooperative and did not appear for the deposition until a warrant was issued for her arrest. Murray's videotaped evidence deposition took place on October 4, 2011.

¶ 107   Murray testified that, when she observed the boys running through the gangway on March 29, 1994, she lived on South Wolcott Avenue. Prior to defendant's trial, she moved on her own to 52nd and Damen Avenue, and she paid her own expenses. The State's Attorney placed her into the witness protection program and she thought that 52nd Street and Damen Avenue was the witness protection address, although she was unsure. She could not remember whether she moved to 80th Street and Loomis Boulevard before or after defendant's trial. The State paid for her moving truck and provided her a money order, which she received after she testified, although she did not remember how much money she received, and she did not receive any additional relocation assistance or money from the State. The State presented a record to Murray that indicated that, on October 2, 1995, the State paid her $550 for one month's rent and $550 for a security deposit, and Murray averred that, although she did receive $1,100 from the State, the money was not the reason why she testified.

¶ 108   Murray testified that, after March 29, 1994, she participated in viewing a lineup to determine whether she could identify the two young men she observed running through her gangway. She identified one as defendant and the other she was not sure of. She testified that she was confident that defendant was one of the men running through the gangway.

¶ 109   On cross-examination, she testified that the signature on the document was hers and she identified a "happy face" drawn under her signature, which was how she signed

all of the documents requiring her signature. She was with Smith; defendant's attorney, Gayle Horn; and one other person that Smith brought with him when she signed the document. Horn asked her only to read it and Horn did not read through the document with Murray line-by-line. It did not take Murray long to read through it–"maybe a few minutes"–and she did not read it all the way through. She stated, "I didn't read it thoroughly. I was basically trying to get them to leave me alone so I didn't go read every line word for word. I kind of just browsed through it."

¶ 110   Murray stated that she signed the affidavit after she spoke with Smith and Horn several times concerning her observing the two young men running through the gangway, viewing the lineup, providing testimony, and the State offering her moving expenses. When asked whether the affidavit truly and accurately reflected what she told Horn and Smith, Murray stated that it did not. She stated that the affidavit was not true and accurate. Defense counsel then questioned Murray about specific parts of the affidavit:

> "DEFENSE COUNSEL:   I'm going to direct your attention to paragraph 20, which says: 'I testified falsely in this trial that I saw Sean Tyler outside a gangway near my house on March 29, 1994. I gave this testimony because of the intense pressure from the cops to do so. As far as I know, Sean Tyler had absolutely nothing to do with this crime.'
>
> That's a true statement, Ms. Murray?
>
> MURRAY: No, it's not. No it's not. I didn't read this–I didn't read this through. I didn't read this through. I didn't lie. What I saw, that's who I saw and that's–I said the truth–I told the truth.
>
> STATE: When did you tell the truth?

MURRAY: From day one.

DEFENSE COUNSEL: I'm going to refer you to paragraph 22, Ms. Murray. That says: 'Ultimately after I testified, I was moved to the house on 82th [*sic*] and Loomis. The State paid for my moving expenses, my security deposit and my first month's rent.'

That's all true, isn't it, Ms. Murray?

MURRAY: I don't know about the first–I don't know about the security deposit. I'm not sure. Yeah. Some of it.

DEFENSE COUNSEL: It's true that the State paid for your moving expenses and for your first month's rent at 82nd and Loomis?

MURRAY: Yes.

DEFENSE COUNSEL: The second sentence of paragraph 22: I never felt comfortable in this house. I felt like it was dirty money, that my testimony had been bought.

MURRAY: I didn't say that.

DEFENSE COUNSEL: You told Gail [*sic*] Horn and Smith that you felt like that was dirty money and that your testimony had been bought, didn't you?

MURRAY: No.

DEFENSE COUNSEL: You told them that during interviews that they had with you on May 31st, 2007?

MURRAY: No. If I was going to be bought, I'd be bought a little bit more than a first month's rent. No, I didn't say that."

¶ 111   Murray acknowledged, however, that she had made corrections, and signed her initials to those corrections, in paragraphs 5, 12, 14, 18, 20, and 22. She averred that she did not read through it all and "just caught bits and pieces" of what she read.

¶ 112   Murray testified that, although Detectives O'Brien, Halloran, and Boudreau were named in her affidavit, she did not know these detectives' names, and that neither Horn nor Smith had told her their names. Horn and Smith showed her a videotape at some point prior to her signing the affidavit and she identified Detectives O'Brien, Halloran, and Boudreau from the videotape, but she told Horn and Smith that she was not sure. She also averred that, although she did say that the detectives were aggressive and intimidating and that she was afraid of police, her "words were turned around" in the affidavit and that she "wasn't worried about them doing anything to [her]."

¶ 113   Murray further testified concerning the lineup:

> "DEFENSE COUNSEL: Paragraph 7 says: 'I was uncomfortable going down to the police station. I was worried about people in the neighborhood calling me a snitch and also felt like I did not get a good enough look at the two boys to identify them. I told the detectives this. The detectives intimidated and threatened me. They made me feel as if I had no choice but to go to the lineup.'
>
> MURRAY: No.
>
> DEFENSE COUNSEL: That's all true?
>
> MURRAY: No.
>
> DEFENSE COUNSEL: Well, you told Gail [*sic*] and Mort that you felt like you did not get a good enough look at the boys to identify them?

35

MURRAY: I said both boys, both boys. I didn't say Sean Tyler. I

saw him clear as day."

She also refuted paragraph 8 of the affidavit, which averred that she was shown pictures of defendant and Taylor prior to the lineup and was told to pick them out. She testified that she was not shown the pictures until after the lineup. Although the detectives had told her "that's right or good job" following her selection in the lineup, they had told her that because she was nervous and shaking, and they "said something, nice job, meaning from me facing my fear of picking them out."

¶ 114   She testified that, in retrospect, she felt "played" by Horn and Smith.

¶ 115                                    2. Witness APD

¶ 116   The APD testified that, in September 1995, he was on the Homicide Task Force and was assigned to defendant's case. In 1995, he had been an assistant public defender for 15 years, including 8 years on the Homicide Task Force. Prior to trial, he requested the State produce any exonerating evidence through a discovery motion, and the State did not return any exonerating evidence and in particular did not produce evidence of an agreement to pay any witness in defendant's trial.

¶ 117   The APD testified that, "immediately prior" to trial, he spoke with Murray, who he had previously been unable to locate since the State did not provide her address. He was able to speak to Murray for "no more than five minutes," during which he did not ask, and Murray did not mention to him, that she entered into any agreement with, or received any money from, the State.

¶ 118   The APD testified that another assistant State's Attorney at the time told him at some point prior to Murray's testimony that the State had moved her to Altgeld Gardens,

36

which he understood to be public housing. The other ASA did not mention providing Murray any money in relation to the move. The APD thought that, since the case was a "gang case," the State was moving her for her safety.

¶ 119   The APD testified that, during cross-examination, he did not ask Murray about the State providing financial assistance to move after she testified. He also did not make any reference in his opening or closing remarks to the move or the State's financial assistance.

¶ 120   The APD testified that he did not mention the relocation because it would highlight the fact that the witness was afraid of defendant "or members of his alleged organization." He stated that juries are prejudiced when gang activity is involved and he believed it was "good strategy" not to mention relocation. He stated that it would have been a "different situation" had Murray been given "30, $40,000 or something."

¶ 121                    3. Testimony of Mort Smith

¶ 122   Defendant's second witness, Mort Smith, a private investigator for the defense, was called as a rebuttal witness to Murray's testimony during her deposition. He testified that he became involved in defendant's case when he was contacted by Gayle Horn, defendant's attorney at the time, who requested that he contact Andrea Murray, whom he then met with on six occasions. The first time he met with Murray, she told him that "this had been bothering her for some time, and that she testified falsely and wanted to know what she could do to make it right."

¶ 123   Smith testified that, during their second meeting, which was held at Horn's office with Horn present, Murray told him about the money she was given by the prosecution. Murray referred to it as "dirty money." She stated that she was uncomfortable staying in her neighborhood because people would consider her a snitch, so the State promised to

move her to another location and pay her security deposit and the first month's rent on her residence. Horn showed Murray pictures of three police officers and Murray recognized Detective O'Brien.

¶ 124   Smith testified that the plan for the third meeting was to meet again during the day on June 13, 2007, at Horn's office for Murray to sign the affidavit. However, "something happened with one of our three schedules" so that the meeting instead took place at Murray's home that night. There were other people at her home that night, although Smith was not aware of their presence. Horn and Smith met with Murray for 15 to 20 minutes in her living room, so that Murray could review the affidavit and sign it. Horn read the affidavit aloud to Murray and Murray read it and made some additions and corrections, which she initialed. After signing the document, Murray "got choked up" and hugged Horn saying, "I am finally glad to get this off my chest."

¶ 125   Smith testified that he administered the oath prior to her signing the document, but he did not notarize it, despite being a notary at the time. "I don't know why. It's something I should have done. I should have affixed my signature and my seal to this document, but I didn't and I didn't follow up on it afterwards." Murray did not tell him that she did not want to be involved with the case, although she said that her boyfriend did not want her involved.

¶ 126   Smith testified that he next met with Murray in January 2008 for about 15 to 20 minutes to follow up on information she had provided concerning her relocation to a different apartment by the State. Murray was helpful and provided the landlord's name and address.

¶ 127   Smith testified that he met with Murray again in January 2010 with law students from the University of Chicago "just to check in to see if there [was] anything else she had to tell [them]." She invited them in, but she mentioned that a prosecutor had visited her and she told them that she no longer wanted to be involved in this case. However, "she never said the affidavit was wrong."

¶ 128   Smith testified that the final time he met with Murray was in March 2010 with an attorney to serve her with a subpoena.

¶ 129   The defense also attempted to enter into evidence Smith's photographs of Murray's residence on South Wolcott where Murray lived when she witnessed the two boys running through her gangway; however, the trial court held that Murray's ability to observe the boys was irrelevant at the third-stage hearing because the matter at issue was her testimony regarding identification.

¶ 130   Smith testified on cross-examination that he never told Murray that defendant was innocent or out of the state when the murder occurred. Further, he never discussed perjury with Murray, although she was aware that, based on her affidavit, there may be additional postconviction proceedings in which it would be possible that she would be called to testify. Although she did not want to testify, she never stated that she was afraid of defendant. Rather, she was scared after the prosecution came to her house with a police officer because "she was afraid she was in trouble with these guys."

¶ 131   Smith testified on cross-examination that, when he met with Murray and Horn at Horn's office on June 7, 2013, they showed Murray photographs of Detectives O'Brien, Halloran, and Boudreau. They decided to show her those three, and did not include beat officers and evidence technicians, because she described speaking with detectives. "There

were only a few detectives on the case." Murray remembered Detective O'Brien's name and face. They never played her a video of detectives or anyone else.

¶ 132   Smith further testified on cross-examination that a person "who worked at the office" notarized Murray's affidavit, but he was not sure when. He did not bring another affidavit for Murray to sign during any of his subsequent meetings with her.

¶ 133   Smith also testified on cross-examination that he had not watched Murray's evidence deposition and that defense counsel was "vigilant" not to provide him any details concerning her recantation of her affidavit. He was only aware that Murray was no longer a witness who would be helpful to the defense, and as a result, he decided to testify.

¶ 134                    4. The Trial Court's Findings

¶ 135   On October 25, 2012, the trial court dismissed defendant's postconviction petition, rejecting both of his remaining claims. First, the trial court held that the evidence presented by the defense, including the APD's testimony, Murray's testimony, the receipt for the rent and security deposit, a memo making the request, and Murray's affidavit, failed to establish the elements of a *Brady* violation. The trial court found that the APD's testimony made clear that the State disclosed to him, prior to his interview of Murray, that she was going to be relocated and he could have questioned her regarding the relocation, but he chose not to as a matter of trial strategy. Further, Murray testified that her trial testimony was not given because she was given money to relocate. The court found that the exhibits corroborated Murray's and the APD's testimony.

¶ 136   Second, the trial court rejected defendant's actual innocence claim. To resolve this claim, the trial court evaluated Murray's and Smith's testimony and Murray's affidavit.

The court stated that, "[a]lthough the affidavit of Miss Murray is admitted, the question becomes how much weight it should be given." The trial court found that the affidavit should be given little weight considering the circumstances, based on a credibility determination between Smith and Murray and their differing testimony regarding the affidavit. The trial court stated:

"I find Miss Murray to be credible. Her testimony was clear. She explained the reasons behind signing the affidavit. She was also positive regarding her prior testimony regarding the identification of Sean Tyler. *** [S]till today in her testimony she was firm in that belief."

The trial court stated that it believed Murray when she testified that Smith and Horn provided her false information about defendant's confession and told her that he was out of town at the time of the shooting.

¶ 137   Furthermore, the trial court found some of Smith's testimony "hard to believe." In particular, the trial court doubted Smith's testimony that, after years of no contact, Murray would "suddenly blurt[] out" to him that she was glad he was there, that she testified falsely, and that she wanted to clear her chest. The court also found it "somewhat puzzling" that Smith did not notarize Murray's signature on the affidavit and could not adequately explain why he failed to notarize the signature, and that a person who was not present at the time would swear to Murray's signature instead.

¶ 138   Consequently, the trial court denied the relief sought in defendant's postconviction petition, and defendant now appeals.

¶ 139                    ANALYSIS

¶ 140   On appeal, defendant raises seven issues: (1) whether defendant is entitled to a third-stage evidentiary hearing on his alleged coerced confession claim; (2) whether Andrea Murray's testimony at defendant's prior evidentiary hearing demonstrates his actual innocence and warrants a new trial; (3) whether defendant is entitled to a third-stage evidentiary hearing on his claim that there was a *Brady* violation where the State failed to disclose a pattern and practice of police misconduct; (4) whether defendant is entitled to a new trial on his claim that there was a *Brady* violation where the State failed to disclose that it paid Andrea Murray money; (5) whether defendant is entitled to a third-stage evidentiary hearing on his ineffective assistance of counsel claim; (6) whether defendant is entitled to a third-stage evidentiary hearing on his claim that the lineup was unduly suggestive; and (7) whether defendant is entitled to relief on a cumulative error basis.

¶ 141   For the following reasons, we reverse and remand for the limited purpose of requiring the trial court to conduct a third-stage evidentiary hearing on defendant's coerced confession claim, and we affirm the dismissal of all of defendant's other claims.

¶ 142                  I. The Post-Conviction Hearing Act

¶ 143   The Act "provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9 (2009); see 725 ILCS 5/122-1 *et seq*. (West 2006). A postconviction proceeding is not a direct appeal but rather a collateral attack on a prior judgment. *People v. Barrow,* 195 Ill. 2d 506, 519 (2001). To proceed, pursuant to the

Act, a defendant files a petition in the trial court in which the original proceeding took place. *Hodges*, 234 Ill. 2d at 9. Any postconviction proceeding not involving the death penalty contains three distinct stages. *Hodges,* 234 Ill. 2d at 10.

¶ 144   At the first stage, section 122-2 of the Act requires that a postconviction petition must, among other things, " 'clearly set forth the respects in which defendant's constitutional rights were violated.' " *Hodges*, 234 Ill. 2d at 9 (quoting 725 ILCS 5/122-2 (West 2006)). A defendant, at the first stage, need only present a limited amount of detail in the petition. *Hodges,* 234 Ill. 2d at 9. Since most petitions are drafted at this stage by *pro se* defendants, the threshold for survival is low and a defendant is only required to allege enough facts to make out a claim that shows the "gist" of a constitutional claim. *Hodges,* 234 Ill. 2d at 9; see *People v. Porter,* 122 Ill. 2d 64, 74 (1988) (stating that only a "gist" of a constitutional claim is needed at this stage). The trial court independently reviews the petition and determines whether "the petition is frivolous or is patently without merit" within 90 days of the filing of the petition. *Hodges*, 234 Ill. 2d at 10. If the court determines that the petition is either frivolous or patently without merit, the court dismisses the petition in a written order. *Hodges*, 234 Ill. 2d at 10; see 725 ILCS 5/122-2.1(a)(2) (West 2006). If the court does not dismiss the petition, then the petition advances to the second stage, where counsel is appointed to indigent defendants (725 ILCS 5/122-4 (West 2006)), and the State then files a motion to dismiss or an answer to the petition (725 ILCS 5/122-5 (West 2006)). *Hodges*, 234 Ill. 2d at 10-11.

¶ 145   At the second stage, the trial court determines whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *People v. Pendleton,* 223 Ill. 2d 458, 472 (2006). All well-pleaded facts that are not

rebutted by the trial record are to be taken as true. *Pendleton,* 223 Ill. 2d at 473. If no such showing is made, the petition is dismissed. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). If, however, a substantial showing of a constitutional violation is shown, the petition is advanced to the third stage, where the trial court conducts an evidentiary hearing. *Edwards*, 197 Ill. 2d at 246; *Pendleton*, 223 Ill. 2d at 471; see 725 ILCS 5/122-6 (West 2006).

¶ 146   At a third-stage evidentiary hearing, the defendant bears the burden of making a substantial showing of a constitutional violation. *Pendleto*n, 223 Ill. 2d at 473 (citing *People v. Coleman*, 206 Ill. 2d 261, 277 (2002)). At the hearing, the trial court "may receive proof by affidavits, depositions, oral testimony, or other evidence," and "may order the [defendant] brought before the court." 725 ILCS 5/122-6 (West 2006).

¶ 147   In the present case, defendant filed a postconviction petition raising seven issues: (1) whether defendant is entitled to a third-stage evidentiary hearing on his alleged coerced confession claim; (2) whether Andrea Murray's testimony at defendant's prior evidentiary hearing demonstrates his actual innocence and warrants a new trial; (3) whether defendant is entitled to a third-stage evidentiary hearing on his claim that there was a *Brady* violation where the State failed to disclose a pattern and practice of police misconduct; (4) whether defendant is entitled to a new trial on his claim that there was a *Brady* violation where the State failed to disclose that it paid Andrea Murray money; (5) whether defendant is entitled to a third-stage evidentiary hearing on his ineffective assistance of counsel claim; (6) whether defendant is entitled to a third-stage evidentiary hearing on his claim that the lineup was unduly suggestive; and (7) whether defendant is entitled to relief on a cumulative error basis.

¶ 148  The trial court advanced defendant's actual innocence claim based on Andrea Murray's recantation and defendant's *Brady* violation claim based on the State's failure to disclose relocation expenses paid to Murray to the third stage, and it dismissed defendant's other claims at the second stage. The trial court then dismissed the actual innocence claim and alleged *Brady* violations after hearing the evidence at the third-stage evidentiary hearing.

¶ 149                               II. Standards of Review

¶ 150  Since some of defendant's claims were dismissed at the second stage and others following a third-stage hearing, we have two separate standards of review.

¶ 151  At the second-stage proceedings, we review the trial court's decision under a *de novo* standard of review. *Pendleton,* 223 Ill. 2d at 473. Under the *de novo* standard of review, the reviewing court does not need to defer to the trial court's judgment or reasoning. *People v. Vincent*, 226 Ill. 2d 1, 14 (2007). *De novo* review is completely independent of the trial court's decision. *United States Steel Corp. v. Illinois Pollution Control Board,* 384 Ill. App. 3d 457, 461 (2008). *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 152  When a petition is advanced to a third-stage evidentiary hearing, where fact-finding and credibility determinations are made, we will not reverse a trial court's decision unless it is manifestly erroneous. *People v. Beaman*, 229 Ill. 2d 56, 72 (2008); *Pendleton,* 223 Ill. 2d at 473 (citing *People v. Childress*, 191 Ill. 2d 168, 174 (2000)). A decision is manifestly erroneous if it contains an error that is " ' "clearly evident, plain, and indisputable." ' " *People v. Morgan,* 212 Ill. 2d 148, 155 (2004) (quoting *People v.*

*Johnson*, 206 Ill. 2d 348, 360 (2002), quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)).

¶ 153                    III. Coerced Confession Claim

¶ 154   On appeal, defendant argues first that the trial court erred in dismissing his claim that Detectives Clancy and Moser obtained an involuntary confession when he was beaten into signing a written statement. In support, defendant argues that two pieces of newly discovered evidence warrant a new trial: (1) the medical affidavit of Dr. Fiona Gallahue; and (2) the pattern of systemic misconduct by the same Chicago police detectives of abusing young African American men into giving confessions. The State responds that, since defendant raised the issue on direct appeal, his claim is barred by *res judicata*. The State also argues that the medical affidavit is not newly discovered and that the evidence of systemic police abuse does not support defendant's claim that he was abused. Since the trial court dismissed defendant's coerced confession claim at the second stage, we review the dismissal *de novo.* As stated, *de novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 155                       A. *Res Judicata*

¶ 156   First, we consider the trial court's finding that defendant's coerced confession claim was barred by *res judicata* because defendant already raised the argument on direct appeal.

¶ 157   Since a postconviction petition is a collateral attack on a judgment, any issue actually previously raised at trial or on direct appeal is *res judicata.  People v. Miller,* 203 Ill. 2d 433, 437 (2002); *People v. Orange,* 195 Ill. 2d 437, 447-48 (2001).

¶ 158   However, the doctrine of *res judicata* is relaxed "where fundamental fairness so requires" or "where the facts relating to the issue do not appear on the face of the original appellate record." *People v. English*, 2013 IL 112890, ¶ 22. The doctrine of *res judicata* is also "relaxed" if the defendant presents substantial new evidence. *People v. Patterson,* 192 Ill. 2d 93, 139 (2000). "The standards addressing when new evidence is sufficiently substantial so as to relax *res judicata* are the same standards used to determine whether newly discovered evidence should result in a new trial." *People v. Barnslater,* 373 Ill. App. 3d 512, 530 (2007). Thus, for new evidence to be sufficient to relax *res judicata* and warrant an evidentiary hearing, " 'the evidence (1) must be of such conclusive character that it will probably change the result on retrial; (2) must be material to the issue, not merely cumulative; and (3) must have been discovered since trial and be of such character that the defendant in the exercise of due diligence could not have discovered it earlier.' " *People v. Mitchell,* 2012 IL App (1st) 100907, ¶ 61 (quoting *People v. Orange,* 195 Ill. 2d 437, 450-51 (2001)).

¶ 159                    1. Newly Discovered Evidence

¶ 160   We next determine whether defendant's evidence is newly discovered. The first piece of evidence is Dr. Fiona Gallahue's affidavit, in which she opined that hematemesis is consistent with defendant's allegation of being beaten on his chest, and that one etiology for acquiring hematemesis is through an intramural esophageal hematoma. Although this information is certainly important, it is not newly discovered. Dr. Gallahue did not personally examine defendant before preparing the affidavit and she based her analysis from the information contained in Dr. Tizes' medical report that was prepared 14 years ago. Moreover, defendant was able to obtain a second medical opinion prior to trial,

47

so Dr. Gallahue's affidavit cannot be considered newly discovered. In addition, the affidavit tells us that a hematoma, which is defined as a swelling containing blood (Webster's New College Dictionary 515 (2d ed. 1999)), could have been caused by defendant's asthma or by a trauma. Most importantly, there is no medical evidence that indicates that defendant had a hematoma. As a result, Dr. Gallahue's is barred by *res judicata* and it will not be considered.

¶ 161   The second piece of evidence is a collection of other cases, affidavits, and reports in which defendants and witnesses alleged abuse by Detectives Clancy, Moser, Foley, O'Brien, Boudreau, and Halloran, the same detectives who investigated the instant case. The evidence points to dozens of instances where one or more of these detectives abused a defendant or a witness, and the vast majority of cases contained allegations of two or more detectives working in concert. The detectives were accused of physically beating people in the vast majority of the cases.

¶ 162   The years when the alleged misconduct occurred spans from 1976 to 2004. The evidence of misconduct occurring after 1995 did not exist at the time of trial, so those cases are new evidence. However, 16 cases of police brutality concerning false confessions are documented in this decision concerning Detective William Moser and 9 for Detective Michael Clancy. Much of that evidence was not "new." However, the standard that we must follow is not whether the evidence was actually in existence at the time of trial, but whether the evidence had been "discovered since trial" and whether it is "of such character that the defendant in the exercise of due diligence could not have discovered it earlier." (Internal quotation marks omitted.) *Mitchell,* 2012 IL App (1st) 100907, ¶ 61. Although much of the alleged abuse occurred prior to defendant's trial, we

cannot say that defendant would have discovered it through due diligence. Many of these cases went through the court system over years and many of the allegations did not surface until many years later. Given the sensitive nature of police investigations and the sheer scale of the criminal justice system, it is unreasonable to expect defense counsel to discover whom these individual detectives were abusing unless counsel interviewed every suspect who was detained by them. See *People v. Patterson*, 192 Ill. 2d 93, 109 (2000) ("beyond interviewing anyone who had ever been a prisoner at Area 2, we can conceive of no manner in which [defense counsel] reasonably could have obtained this information"); *People v. Reyes*, 369 Ill. App. 3d 1, 20 (2006) ("the various allegations against [the detective] could have been discovered prior to trial only if defense counsel had interviewed every person ever detained by [the detective]"). As a result, we consider defendant's evidence of cases existing prior to his trial to be newly discovered for the purposes of relaxing the doctrine of *res judicata*. Some of the complaints are of such a character that they mirror the claims raised by defendant here.

¶ 163        2. Evidence that Could Reasonably Change the Result at Trial

¶ 164  Next, we consider whether defendant's evidence of systemic police abuse is material and would have changed the result at trial. In his petition, defendant details dozen of cases that demonstrate a longstanding pattern of systemic abuse by Detectives Boudreau, Clancy, Foley, Halloran, Moser, and O'Brien. In his testimony at trial, defendant identified Detective Clancy as one of the detectives that physically abused him, and in his petition, he identifies a multitude of other cases in which it is claimed that these same two detectives that interrogated him physically beat suspects to obtain confessions. We have no way of determining the truth of the matter and as a result, that is

why we are remanding this issue back to the trial court for a third-stage evidentiary hearing.

¶ 165   In 1992, Harold Hill, a 16-year-old, Dan Young, and Peter Williams claimed that they were beaten by Detectives Moser, O'Brien, Boudreau, and Halloran until they each confessed to a rape-murder. The detectives kicked and struck Young, who had an IQ of 56, and he ultimately confessed. Williams was chained to a radiator and forced to urinate on himself, and detectives struck him with a blackjack. As a result of the torture, Williams confessed to the crime, even though he was incarcerated for another offense at the time. Williams was never charged. Hill and Young were both convicted and were ultimately released 12 years later after DNA evidence proved that they could not have committed the crime. Hill and Young spent 12 years in prison for a crime they did not commit.

¶ 166   In 1976, defendants Michael Evans and Paul Terry claimed that Detective Moser and two other police officers fabricated evidence, manipulated witnesses, and caused Evans psychological coercion in giving false confessions. The defendants' cases and crimes were not related.

¶ 167   Evans spent 27 years incarcerated for a murder and rape. DNA evidence later exonerated him of the crime. In a lawsuit filed in the federal court, Evans v. City of Chicago, No. 04 CV 03570 (N.D. Ill. Jan. 26, 2006), it is alleged that Moser and other officers fabricated and manufactured evidence manipulating multiple witnesses to falsely implicate Evans, and used physical violence and psychological intimidation to obtain Evans to falsely confess to a crime he did not commit.

¶ 168    In 1991, Detectives Clancy, Foley, Boudreau, and Halloran interrogated 15-year-old John Plummer for 36 hours straight. During that time, Plummer claimed that the detectives struck him in the face, stomach and side, and at times struck him with a flashlight. Prior to the interrogation, Aaron Johnson, a worker at the Cook County juvenile detention center who was responsible for the movement of the juveniles at the detention center, observed two police officers transport Plummer from the facility and he observed no injuries on Plummer at that time. When the officers returned with Plummer, Johnson observed a lump under Plummer's left eye, swelling on the left side of his forehead, and he appeared to have been crying. One of the officers told Johnson that they "put another murder on [Plummer]."

¶ 169    In 1980, defendant William Simpson claimed that he was slapped, strip searched, had his eyeglasses broken, and threatened that he would remain handcuffed to the wall until he was ready to cooperate by Moser and another police officer. Apparently, Simpson had been on drugs and needed medical attention from withdrawal symptoms but Moser and another officer interrogated him almost continuously "from 10:30 a.m. to dawn," and Simpson claimed Moser physically abused him until he confessed to the murder of the victim.

¶ 170    In 1990, defendant Eric Johnson claimed that Moser and three other police officers struck him on the face, knocked him to the ground, and kicked him in the stomach, chest, and face causing him to give a false confession. Following a jury trial, Johnson was convicted of two counts of first-degree murder and attempted armed robbery based on accountability, and sentenced to life imprisonment for the two murders and 10 years for attempted armed robbery.

¶ 171   In 1990, Demond Weston claimed that Moser and two other officers slapped and physically beat and psychologically coerced him into a confession. An OPS file memo attached to the postconviction petition reveals that Weston was 17 years old when he was convicted of first-degree murder and attempted first-degree murder and sentenced to 45 years in the IDOC. The evidence in the case was overwhelming; however, Weston alleged that Detective Moser, with two other officers, physically abused him while being interrogated. Moser is reported to have slapped him approximately 10 times. Weston never received any medical attention and his only proof of injury was his testimony. He filed a postconviction petition that he confessed as a result of the beating and promises that he could go free if he told the police what they wanted to hear.

¶ 172   In 1991, defendant Sandy Curtis claimed Detective Moser and another detective struck him on his face and lower body with their fists in order to obtain his confession.

¶ 173   In 1993, Lillian White made a complaint to the OPS concerning physical abuse to her son Emmett, age 22, claiming that, during an interrogation, Detective Clancy stepped on the right side of her son's face while he was on the ground and struck him about the face and body in order to obtain his confession. Emmett was arrested for a quadruple homicide and attempted homicide that occurred in Milwaukee, Wisconsin.

¶ 174   In 1993, defendant Tyrone Hood made a complaint to the OPS that Detective Michael Clancy struck him about the body, stepped on his neck and penis, put a gun to his mouth, and searched his house without a warrant or his consent. Also, codefendant Terry King, age 20, complained that Clancy struck him in the head and body with his fists, put a gun in his mouth, and arrested him without probable cause. Three other officers were also mentioned as participants. The complaints were initially made by the

defendants' mothers. Both defendants were suspects in a murder investigation. King was ultimately cleared, but charges were brought against Hood. King later filed a civil suit in federal court against Detective Clancy and others for false arrest and excessive force.

¶ 175  In 1992, Anthony Williams, age 17, claimed that he was beaten by Detective William Moser and four other police officers into confessing to first-degree murder and armed robbery. The trial court found that his confession was voluntary and under the totality of the circumstances, the appellate court found that the trial court's finding was not against the manifest weight of the evidence. *People v. Williams*, 303 Ill. App. 3d 33 (1999).

¶ 176  In 1993, defendant Otha Anderson claimed that Detective William Moser and other police officers knowingly withheld exculpatory information, physically beat him and provided a suggestive lineup causing his conviction and a life sentence.

¶ 177  In 1994, defendant Alejandro Ruvalcaba, age 16, was a suspect in a murder investigation and claimed that he confessed to the crime after Detective Moser showed him a picture of Ruvalcaba's girlfriend Diana Caguana and their baby, and told him to confess or Moser would "get Caguana and get the truth out of her, and if she tried lying [Moser] would make sure he put her in jail and [would] take the baby, and make sure the baby ended up in D.C.F.S."

¶ 178  In 1994, defendant Antoine Ward claimed that Detective Michael Clancy stepped on his left hand; struck him in the head; refused to allow him to use the bathroom, causing him to urinate in a desk drawer; and interrogated him for 48 hours. Ward gave an incriminating statement, which the trial court found to be voluntarily made, and he was

convicted for murder under the accountability theory and his case was affirmed on appeal.

¶ 179   These are just some of the many cases that involve alleged abuse by Detectives Clancy and Moser. Each case follows a disturbing pattern in which the detectives beat suspects to coerce a confession, often striking them on their face and chest. Defendant testified at trial that the Detective Clancy similarly beat him on his face and chest to coerce him to confess.

¶ 180   Defendant also presents many claims of abuse by Detectives Foley, O'Brien, Boudreau, and Halloran. The State argues on appeal that this evidence does not relax *res judicata* because it does not support defendant's claim of abuse since they were not the detectives who allegedly beat him.

¶ 181   However, each of these detectives played an active role in the investigation and it is claimed that their actions in concert resulted in defendant's conviction. Each of these detectives were listed on the police report as arresting officers. Since the vast majority of the cases presented by defendant involve allegations of police misconduct by two or more detectives, it is crucial to consider the claims of systemic pattern of abuse in the context of several officers working together to obtain a false confession in the case at bar.

¶ 182   Furthermore, Detective O'Brien interviewed the eyewitnesses to the shooting, including Murray, the only witness to place defendant at the scene of the crime. Defendant's petition contains many claims in which Detective O'Brien coerced witnesses into making false statements.

¶ 183   In one such case in 1993, it is claimed that Detectives O'Brien, Boudreau, and Halloran beat Tyrone Reyna the day after his 16th birthday. The detectives refused to let

him speak to his family and he ultimately confessed to a murder. The detectives also arrested Nicholas Escamilla and Miguel Morales for the murder despite a lack of physical evidence or an eyewitness linking them to the crime. It is claimed that the detectives beat both Escamilla and Morales during interrogations, and they threatened to send Escamilla's pregnant wife to jail if Escamilla did not confess. Escamilla confessed, but Morales resisted, and it is claimed that the detectives then coerced John Willer and Raphael Robinson to identify Morales as the killer. It is further claimed that, during the lineup, Detective O'Brien grabbed Robinson by the neck and asked Robinson how many fingers he was holding up. When Robinson answered "three," Detective O'Brien used this response to say Robinson identified person number three. Detective O'Brien also told Robinson prior to trial who had committed the murder and where that person would be sitting in the courtroom.

¶ 184   In 1998, Detectives O'Brien, Boudreau, and Halloran arrested Jonathon Tolliver, age 16, for the shooting death of a police officer. It is claimed that the detectives arrested Tolliver at 4 a.m. and held him for a 24-hour period, during which they physically abused him and denied him food and access to an attorney. Tolliver made incriminating oral statements as a result. It is also claimed that the detectives also coerced incriminating statements from witnesses through physical threats and denying them food or access to a parent or attorney. When these witnesses later refused to repeat the coerced false statements at trial, the State charged them with perjury and at least one witness went to jail on the charges.

¶ 185   In 1996, Kylin Little witnessed a murder and it is claimed that Detectives O'Brien, Halloran, and Boudreau physically and psychologically abused him until he implicated Eric Gibson as the shooter. Little later fully recanted his statement to the police.

¶ 186   These are summaries of just a few of the many cases where Detective O'Brien and others were alleged to have coerced witnesses into providing false statements or testimony. The evidence of abuse in defendant's petition shows allegations of a systemic pattern of abuse by the detectives that investigated defendant's case. If this evidence was available to defendant and he presented it at trial, it could have reasonably undermined the detectives' credibility. Even one incident of similar misconduct by the same detectives can be sufficient to show intent, plan, motive, and could impeach the officers' credibility. *People v. Banks*, 192 Ill. App. 3d 986, 994 (1989). The evidence of systemic abuse by these detectives considered together with the officers' testimony that defendant voluntarily reached out to them prior to his arrest and defendant's testimony that they beat him while he was in custody into confessing to a crime that he did not commit could have created a different result. In addition, Bonner's testimony that defendant's face appeared swollen and that he told her that he was beaten, Dr. Tizes' testimony that defendant was treated at the hospital for vomiting blood immediately after his confession, and Jones' testimony that defendant was playing video games with him at the time of the crime raises a serious doubt as to defendant's guilt when we consider that the detectives involved have a history of claims of police brutality. This evidence of claims of systemic abuse by the officers involved in his case is material in deciding defendant's guilt or innocence here.

¶ 187          B. Substantial Showing of a Constitutional Violation

¶ 188   Having found that *res judicata* does not bar consideration of this evidence, we now determine whether defendant made a substantial showing of a constitutional violation.

¶ 189   Illinois courts have consistently held that a "pervasive pattern of criminal conduct by police officers" is enough for courts to reconsider the voluntariness of a defendant's confession. *People v. Mitchell,* 2012 IL App (1st) 100907, ¶ 63 (citing *People v. Patterson,* 192 Ill. 2d 93, 139-45 (2000)); *People v. King,* 192 Ill. 2d 189, 193-99 (2000); *People v. Cannon,* 293 Ill. App. 3d 634, 640 (1997). Here, the countless instances of claims of police misconduct cited in defendant's petition establish a troubling pattern of systemic abuse by the same detectives that interrogated him and investigated his case that calls into question whether defendant's confession was in fact the product of physical coercion. This court is obligated to consider all well-pleaded facts that are not positively rebutted by the trial court record as true. *Pendleton,* 223 Ill. 2d at 473. In light of our consideration of allegations of systemic abuse as true, defendant has made a substantial showing of a longstanding pattern of police misconduct that could have resulted in his coerced confession and support his claim of actual innocence. As a result, defendant is entitled to a third-stage evidentiary hearing to determine whether a new trial is warranted.

¶ 190 The State claims that defendant did not make a substantial showing of a constitutional violation because the evidence does not link the pattern of abuse to defendant. However, there are several similarities that link this pattern of abuse to defendant's claim that his confession was coerced. For one, the type of abuse in many of the cases cited by defendant is similar to the type of beating that defendant claimed he

57

received from the detectives. Dozens of suspects alleged that detectives struck them in the face and chest to force them to confess, just as defendant testified at trial. Also, the reports of systemic abuse took place during the same time period when defendant was beaten while in custody. Although there are a few outliers many years removed, the vast majority of the cases that defendant cites show abuse that occurred between 1991 and 1998, within three years before defendant's claim of abuse and within three years after his trial, and there are multiple claims of abuse in every year during that timeframe. Furthermore, the reports of abuse also implicate the same detectives who worked on defendant's case, including many instances of abuse by the very two detectives that defendant claims beat him and coerced him to sign a confession. As in the cases of Weston or Plummer, multiple suspects alleged that Detectives Clancy and/or Moser physically beat them in order to force a confession. Additionally, as stated, the allegations of abuse by Detectives Foley, O'Brien, Boudreau, and Halloran show a pattern and practice of misconduct, in which these detectives acted in concert to coerce suspects and witnesses into providing false statements. All these factors link the evidence of abuse to defendant's claim that he was beaten into confessing.

¶ 191    The State also argues that there is no evidence that defendant was injured in police custody and cites *People v. Maxwell*, 173 Ill. 2d 102, 120-21 (1996), in support of its contention that a defendant cannot present evidence of misconduct of other suspects by itself without some evidence that the defendant was injured. However, *Maxwell* reviewed the dismissal of defendant's second-stage abuse claim on a manifestly erroneous standard, which is much higher than the *de novo* standard that our supreme court now says we must use. *People v. Coleman*, 183 Ill. 2d 366, 388 (1998). Also, *Maxwell*

involved a case where the defendant claimed that the police had injured him but his own evidence did not support his claim. *Patterson*, 192 Ill. 2d at 143. Additionally, our supreme court later clarified that "the fact that the defendant has suffered a physical injury is only one of many factors to consider when determining whether evidence of prior allegations of police brutality are admissible. The question of relevancy is a determination to be made by the trial court after a consideration of, *inter alia*, the defendant's allegations of torture and their similarity to the prior allegations." *Patterson*, 192 Ill. 2d at 144-45.

¶ 192 In this case, there is evidence that defendant was injured in police custody because his cousin testified that his face appeared swollen and defendant was treated at the hospital for vomiting blood. Moreover, even if the evidence is questionable that defendant was injured while in custody, he established a sufficient link between the evidence of systemic abuse and the instant case, as we previously discussed. The other cases of claimed abuse involve the same detectives that defendant claims obtained an involuntary confession through physical abuse and occurred during the same time period that defendant claims he was abused, and the cases show a similar pattern of detectives striking suspects in the face and chest to coerce them into confessing.

¶ 193 As a result, defendant has made a substantial showing of a constitutional violation, and as noted, we remand to the trial court to hold a third-stage evidentiary hearing on this claim. An evidentiary hearing will allow the trial court to determine whether any of the detectives who interrogated defendant may have participated in systemic and methodical abuse and whether those detectives' credibility at trial might have been impeached as a result. *Patterson*, 192 Ill. 2d at 145.

¶ 194                         IV. Actual Innocence Claim

¶ 195   Defendant's actual innocence claim based on Andrea Murray's affidavit recanting her testimony at trial was dismissed following a third-stage evidentiary hearing; therefore, we review fact-finding and credibility determinations for manifest error and questions of law *de novo.* As stated, manifest error means an error that is clearly evident, plain, and indisputable (*Morgan,* 212 Ill. 2d at 155), and *de novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 196   To succeed on a claim of actual innocence, defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). "New" means that "the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *People v. Coleman*, 2013 IL 113307, ¶ 96. The evidence is material if it is relevant and probative of the petitioner's innocence. *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997). "Noncumulative" means that the evidence adds to what the jury heard, and "conclusive" means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96.

¶ 197   Defendant raises three arguments concerning his actual innocence claim: (1) that the trial court erred because it only advanced to a third-stage evidentiary hearing the evidence of Murray's recantation and that it did not consider all of the evidence that defendant cited in support of his actual innocence claim; (2) that the trial court applied the wrong standard in assessing Murray's testimony at the third-stage evidentiary hearing since it dismissed the actual innocence claim before our supreme court's decision in

*Coleman*, 2013 IL 113307; and (3) that the trial court's findings were manifestly erroneous because Murray's testimony at the third-stage evidentiary hearing differed from her testimony at trial.

¶ 198 Defendant first argues that the trial court improperly evaluated his actual innocence claim because it considered the evidence of Murray's recantation alone and not in conjunction with the other evidence he cited in support of his claim. Defendant originally cited the following evidence in support of his actual innocence claim: (1) Murray's affidavit recanting her trial testimony; (2) affidavits of two additional alibi witnesses; (3) Dr. Gallahue's medical affidavit; and (4) evidence of systemic police misconduct. The trial court allowed defendant's actual innocence claim to proceed to a third-stage evidentiary hearing to consider only the evidence that Murray recanted her trial testimony.

¶ 199 As we have discussed elsewhere in this opinion, Dr. Gallhue's affidavit was not new evidence and defendant's constitutional rights were not violated by counsel's failing to locate the two alibi witnesses, and as a result, the trial court did not err when it declined to consider that evidence now. Also, since defendant already presented an alibi witness at trial who testified that he was with defendant, Poochie, and Binky at the time of the crime, Poochie's and Binky's testimonies would be cumulative because it would not add to what the jury already heard. Defendant argues that their testimonies are noncumulative because, unlike Jones, they were not friends of defendant and they could not be impeached by their relationship with defendant. Despite defendant's assertion, defendant testified at trial that Poochie and Binky were his friends, even though he did

not know their real names. As a result, the trial court did not err when it declined to consider the affidavits of two additional alibi witnesses.

¶ 200 However, defendant is entitled to have the evidence of systemic police misconduct considered by the trial court in an evidentiary hearing. The standard to establish a freestanding claim of actual innocence is that defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *Washington*, 171 Ill. 2d at 489. As we have already stated, we are remanding for the trial court to hold a third-stage evidentiary hearing on defendant's evidence of systemic police misconduct because the evidence was sufficient to relax the requirements of *res judicata* and the evidence made a substantial showing of a constitutional violation. The standard for which we consider relaxing *res judicata* on a constitutional claim is nearly identical that of actual innocence: " 'the evidence (1) must be of such conclusive character that it will probably change the result on retrial; (2) must be material to the issue, not merely cumulative; and (3) must have been discovered since trial and be of such character that the defendant in the exercise of due diligence could not have discovered it earlier.' " *People v. Mitchell,* 2012 IL App (1st) 100907, ¶ 61 (quoting *People v. Orange,* 195 Ill. 2d 437, 450-51 (2001)). For the same reasons we discussed earlier, the evidence of systemic police misconduct is new, material, noncumulative, and is so conclusive it could reasonably change the result on retrial. As a result, the evidence of systemic police misconduct is sufficient to support defendant's claim of actual innocence, and the trial court erred when it did not advance this evidence to a third-stage evidentiary hearing.

¶ 201 In its order advancing the issue of Murray's recantation to a third-stage evidentiary hearing, the trial court stated that "[a] 'free-standing' claim of innocence means that the newly discovered evidence being relied upon 'is not being used to supplement an assertion of a constitutional violation with respect to [the] trial' " (quoting *Washington*, 171 Ill. 2d at 479). The trial court contrasted this case to *Washington*, where the defendant's actual innocence claim presented evidence in which a witness, who was previously silent for fear of her life, eventually came forward after the defendant's conviction and stated that she observed two different men commit the crime instead of the defendant. *Washington*, 171 Ill. 2d at 477-78. Although the defendant in *Washington* presented newly discovered evidence sufficient to grant relief (*Washington*, 171 Ill. 2d at 489-90), here the trial court found that defendant's allegations do not support a "free-standing" claim of actual innocence. The trial court explained:

"In this order, we have already held [defendant's] constitutional rights were not violated by the police, the State, his trial or appellate counsel, and that his confession was voluntary. Consequently, these allegations do not support a 'free-standing' claim of actual innocence. Rather, the newly discovered evidence [defendant] points to here is not evidence at all and is being used to supplement his assertion of a constitutional violation with respect to trial. [Defendant] has therefore not properly raised a claim of actual innocence under *Washington*, and the claim is dismissed."

¶ 202 However, the trial court's reliance on *Washington* is misplaced. As stated, the evidence of systemic abuse does make a substantial showing of a constitutional violation,

so the trial court was incorrect in its assertion the evidence was not evidence at all. Also, although defendant presented this evidence in his constitutional claim that his confession was coerced, the evidence is not being used to merely supplement the constitutional claim since the evidence supports a showing of actual innocence on its own because defendant claims that his confession was not voluntary. As such, this evidence supports a freestanding claim of actual innocence, and defendant is entitled to have the evidence considered in an evidentiary hearing. The trial court is instructed to hold a third-stage evidentiary hearing on the evidence that the police engaged in a systemic pattern of misconduct.

¶ 203                                    V. *Brady* Violations

¶ 204   In his postconviction petition, defendant raised two claims of *Brady* violations, arguing: (1) that the State withheld evidence of a pattern and practice of police misconduct; and (2) that the State failed to disclose Andrea Murray's relocation expenses.

¶ 205                                    A. *Brady* Doctrine

¶ 206   Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001) is a codification of the due process requirements espoused in the United States Supreme Court case of *Brady v. Maryland*, 373 U.S. 83 (1963). *People v. Simon,* 2011 IL App (1st) 091197, ¶ 99. Rule 412(c) provides that:

> "Except as is otherwise provided in these rules as to protective orders, the
> State shall disclose to defense counsel any material or information within
> its possession or control which tends to negate the guilt of the accused as
> to the offense charged or which would tend to reduce his punishment
> therefor. The State shall make a good-faith effort to specifically identify

by description or otherwise any material disclosed pursuant to this section based upon the information available to the State at the time the material is disclosed to the defense. At trial, the defendant may not offer evidence or otherwise communicate to the trier of fact the State's identification of any material or information as tending to negate the guilt of the accused or reduce his punishment." Ill. S. Ct. R. 412(c) (eff. Mar. 1, 2001).

To establish a *Brady* violation, a defendant must show that: "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). In addition, "defendant must establish that he requested the evidence in question, and that the State in fact possessed it and failed to disclose it." *People v. House*, 141 Ill. 2d 323, 387 (1990).

¶ 207                    B. Pattern and Practice of Misconduct

¶ 208  Defendant's first *Brady* violation claim, that the State withheld evidence of a systemic pattern and practice of police misconduct, was dismissed at the second stage, and we review the trial court's dismissal *de novo.* As stated, *de novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 209  Defendant argues that he is entitled to a third-stage evidentiary hearing on his *Brady* claim because the State withheld evidence of systemic police misconduct, which is material and likely to change the result at trial. For the reasons we discussed earlier, the evidence of systemic abuse was material and of such conclusive character that it could

reasonably change the result at trial, and the evidence supported a substantial showing of a constitutional violation. As such, this evidence satisfies the two of the *Brady* claim requirements that the evidence must be favorable to defendant and that he was prejudiced by its absence.

¶ 210 However, defendant must also show that the evidence was suppressed by the State. First, a number of the claims of abuse did not exist until after trial, so the State cannot have suppressed evidence that it was not aware of at that point in time. Second, we have found that this evidence is newly discovered sufficient to relax the requirements of *res judicata*, and that it is unreasonable to expect defense counsel to discover who these individual detectives were abusing unless counsel interviewed every suspect who was detained by them. This same rationale applies to the State as well. There is nothing in the appellate record that shows this evidence was known and available to the prosecutor prior to trial, and defendant does not make an argument explaining how the prosecutor could have known of these prior allegations of abuse.

¶ 211 As a result, we cannot say that the evidence of systemic abuse was known and available to the State prior to trial and that it failed to disclose the evidence, and the trial court did not err when it dismissed defendant's *Brady* claim at the second stage.

¶ 212                          C. Andrea Murray's Relocation Expenses

¶ 213 Defendant's second *Brady* violation claim, that the State failed to disclose Andrea Murray's relocation expenses, was dismissed following a third-stage evidentiary hearing, and we review fact-finding and credibility determination for manifest error and questions of law *de novo.* As stated, manifest error means an error that is clearly evident, plain, and indisputable (*Morgan,* 212 Ill. 2d at 155), and *de novo* consideration means that the

reviewing court performs the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 214    At the third-stage evidentiary hearing, Murray testified that she became afraid once she learned that the shooting was gang-related and that she was leaning toward not testifying because she lived in the neighborhood where the shooting occurred and she feared for her safety. To protect Murray, the State placed her in witness protection and provided her money to move, including $550 for one month's rent and another $550 for a security deposit. Murray testified that she could not have moved without assistance from the State and that her testimony was not given because of the money she received.

¶ 215    The APD also testified at the third-stage evidentiary hearing that the assistant State's Attorney told him prior to trial that they had moved Murray but failed to mention that Murray was provided financial assistance. The APD did not press for more information about the move and he ultimately decided not to mention the fact at trial because he believed it would have hurt defendant's case. The APD opined that there is "high prejudice when gang activity is involved and you have a jury in the box" and that "it is probably a good strategy" not to mention that the State relocated Murray.

¶ 216    The testimony at the evidentiary hearing shows that the first two elements to establish a *Brady* claim are satisfied. First, the undisclosed evidence is favorable to defendant because it could have impeached Murray by showing that she received financial assistance and the defense could have argued that the money was in exchange for her testimony. *Beaman*, 229 Ill. 2d at 73-74. Second, the State told defense counsel that they moved the witness but failed to inform defense counsel that they paid for Murray's relocation expenses. *Beaman*, 229 Ill. 2d at 73-74.

¶ 217  However, defendant has not satisfied the third prong, which requires a showing that he was prejudiced because the evidence is material to his guilt. *Beaman*, 229 Ill. 2d at 73-74. Murray was unequivocal in her testimony at trial and at the third-stage evidentiary hearing that she observed defendant in the gangway on the night of the crime with a gun, and she insisted that her testimony was not given for the money she received by saying, "If I was going to be bought, I'd be bought a little bit more than a first month's rent." Furthermore, defense counsel testified that he believed it was a "good strategy" not to mention the relocation at trial, and he stated that it would have been a "different situation" had Murray been given "30, $40,000 or something." Although the evidence that the State paid for Murray's relocation expenses could have impeached her testimony, it would have been of little consequence in light of the explanation that she was being moved to protect her out of fear of retaliation from defendant's gang. As such, defendant was not prejudiced by the exclusion of this evidence since it was not material to his conviction. The testimony, in all probability, would have been more prejudicial to defendant if the jury was told the witness had to be relocated. See *People v. Weaver*, 92 Ill. 2d 545, 559 (1982) (a new trial should be granted where the defendant is prejudiced by the discovery violation and the trial court failed to eliminate the prejudice).

¶ 218  Defendant compares this case to *People v. Blackman*, 359 Ill. App. 3d 1013 (2005), where we remanded for a new trial where the State failed to disclose that it paid for a testifying witness' relocation expenses. However, *Blackman* is distinguishable because the amount the State paid to the witness was $20,000, a significantly higher amount than the $1,100 the State paid Murray. *Blackman*, 359 Ill. App. 3d at 1020. Also, defense counsel in *Blackman* also stated on the record that, had he known about the facts

concerning the witness' relocation, he would have proceeded differently. *Blackman*, 359 Ill. App. 3d at 1020. We found that the discovery violation also impacted the defendant's decision to opt for a bench, rather than a jury, trial. *Blackman*, 359 Ill. App. 3d at 1020. In the instant case, defense counsel testified that he would not have brought up the relocation at trial and that it would have been a different situation had the State paid Murray a sum of money significantly higher than what she actually received.

¶ 219   As a result, the trial court did not err when it dismissed defendant's *Brady* claim after the third-stage evidentiary hearing.

¶ 220                    VI. Claim of Ineffective Assistance of Counsel

¶ 221   The trial court dismissed defendant's ineffective assistance of counsel claim at the second stage, which we review *de novo*. As stated, *de novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 222                              A. *Strickland* Test

¶ 223   " 'The sixth and fourteenth amendment of the United States Constitution guarantee the fundamental right of a defendant in a criminal case to be effectively assisted by counsel.' " *People v. Young*, 347 Ill. App. 3d 909, 927 (2004) (quoting *People v. Spann*, 332 Ill. App. 3d 425, 429 (2002), citing U.S. Const., amends. VI, XIV). A claim of ineffective assistance of counsel is judged according to the two-prong, performance-prejudice test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 525 (1984); *People v. Boyd*, 363 Ill. App. 3d 1027, 1034 (2006). "To obtain relief under *Strickland*, a defendant must prove [(1)] that defense counsel's performance fell below an objective standard of reasonableness and [(2)] that

this substandard performance caused prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would have been different." *Boyd*, 363 Ill. App. 3d at 1034 (citing *Strickland*, 466 U.S. at 687-88). A defendant must satisfy both prongs of the *Strickland* test to prevail on a claim of ineffective assistance of counsel. *People v. Flores*, 153 Ill. 2d 264, 283 (1992). We do not need to consider the first prong of the *Strickland* test when the second prong cannot be satisfied. *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 224          B. Failure to Corroborate Claims of Police Misconduct

¶ 225 Defendant first argues that his trial counsel was ineffective for failing to corroborate claims of police misconduct. In support, defendant relies on the affidavit of Julie Hull, an assistant public defender who represented him on direct appeal. Hull stated in her affidavit that she first met defendant in 1992 when he served as an eyewitness and exculpated her client, "M.W.," who was "shocked" into signing a confession by detectives at Area Three Violent Crimes. Since defendant had heard of the allegations of detectives' abuse, he was afraid to testify in M.W.'s case, so Hull obtained a protective order preventing the police involved in M.W.'s case from contacting defendant. In 1993, M.W. filed a complaint against the City of Chicago; Sergeants Byrne and Bonke; Detectives O'Brien, Maslanka, Paladino, Boudreau and Kill; former Area Three Commander Jon Burge; and former Superintendent LeRoy Martin. In 1994, Hull met with defendant following his arrest and he told her that detectives beat him into signing a confession. Hull stated that she attempted to explain this information concerning M.W.'s case to defendant's trial counsel because she felt it was relevant to defendant's motion to suppress, but trial counsel rejected her help, even though she told him she would provide

70

information concerning Detectives O'Brien and Boudreau. Defendant argues that trial counsel provided ineffective assistance because he did not investigate the information that Hull attempted to provide him and he did not call her to testify at trial. Defendant argues that her information concerning M.W.'s case would show that the detectives had a motive to frame defendant for murder, which would have bolstered his motion to suppress, and that he is entitled to an evidentiary hearing on this evidence.

¶ 226 However, trial counsel's decision not to investigate Hull's information or call her to testify at the suppression hearing was not objectively unreasonable because it was a matter of trial strategy. "Where circumstances known to counsel at the time of his investigation do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation." *People v. Pecoraro*, 175 Ill. 2d 294, 324 (1997). At the time of the suppression hearing, the allegation that Detectives O'Brien and Boudreau, both of whom had no contact with defendant, were involved in a plot with Detectives Clancy and Moser, neither of whom were involved in M.W.'s case, to frame defendant for testifying as a defense witness in M.W.'s case was pure speculation, and it was not unreasonable for trial counsel to not pursue that theory. Without more evidence showing a motive, the inclusion of this evidence would not have affected the outcome of the suppression hearing. Notably, neither Detective O'Brien nor Detective Boudreau testified at the suppression hearing, so they provided no testimony for defendant to impeach. As a result, defendant was also not prejudiced by the absence of this evidence at his suppression hearing, and trial counsel was not ineffective.

¶ 227                    C. Failure to Investigate Alibi Witnesses

¶ 228   Defendant next claims that trial counsel was ineffective for failing to investigate and call additional alibi witnesses to testify at trial. Defendant testified at trial that, at the time of the crime, he was with Donald Jones and two friends that he knew only as "Poochie" and "Binky." Jones testified as an alibi witness at trial and corroborated defendant's version of events, but in his affidavit attached to defendant's postconviction petition, Jones stated that he told "someone" at the public defender's office Poochie's and Binky's real first names and where to find them. Defendant argues that trial counsel was ineffective because he failed to locate the two additional alibi witnesses and call them to testify at trial.

¶ 229   However, defendant was not prejudiced because trial counsel already presented a witness to corroborate defendant's alibi. Since Jones testified that he was with defendant at the time of the murder, the addition of further alibi witnesses would have been cumulative. In light of all the evidence against defendant, including Murray's testimony and defendant's confession, there is no probability that the result of the trial would have been different, and defendant did not suffer prejudice. Since we have found defendant has not satisfied the second prong of the *Strickland* test, we need not consider the first prong. *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 230                    D. Failure to Corroborate Claim of Abuse

¶ 231 Defendant also claims that his trial counsel was ineffective for failing to corroborate his claim that his confession was coerced because counsel failed to present additional medical testimony and call defendant to testify at the suppression hearing.

72

¶ 232   However, defendant cannot show that trial counsel's performance was objectively unreasonable. First, since defendant has not explained what type of medical evidence trial counsel should have presented at trial, we cannot say that trial counsel was ineffective or that defendant was prejudiced. Dr. Tizes testified that he examined defendant at the hospital and treated him for hematemesis, or vomiting blood, although Dr. Tizes did not find "objective information" that defendant had in fact been vomiting blood and did not provide a diagnosis. In his postconviction petition, defendant included Dr. Gallahue's affidavit, in which she largely repeated Dr. Tizes' findings, but opined that hematemesis could potentially be caused by a blow to the chest. Even if evidence similar to Dr. Gallahue's affidavit were presented at trial, there is no probability that it would have changed the outcome. Defendant has not shown any medical opinions that the blood he coughed up came from a trauma to his chest, as it could have been caused by his asthma.

¶ 233   Second, trial counsel's decision not to call defendant to testify was a matter of trial strategy. *Flores*, 128 Ill. 2d at 106. Trial counsel may have decided not to call defendant for a variety of reasons, such as not wanting to put defendant in the position of having to explain why he did not complain of the alleged abuse or why Dr. Tizes did not observe any injuries on him, or to avoid having inconsistencies in defendant's testimony which could have been used to impeach him at trial. As a result, trial counsel did not act unreasonably in not calling defendant to testify and defendant did not suffer prejudice because there is no showing that if defendant testified, the motion had a reasonable chance of being granted. *Boyd*, 363 Ill. App. 3d at 1034.

¶ 234                    VII. Claim of an Unduly Suggestive Lineup

¶ 235   Defendant next claims that that trial court erred when it dismissed his claim that the lineup in which Murray identified him was unduly suggestive. Since the trial court dismissed defendant's claim at the second stage, we review the trial court's dismissal *de novo*. As stated, *de novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 236   The process of eyewitness identification violates a defendant's constitutional rights where there is " 'a substantial likelihood of irreparable misidentification.' " *Perry v. New Hampshire,* 565 U.S. __, __, 132 S. Ct. 716, 724 (2012) (quoting *Neil v. Biggers,* 409 U.S. 188, 201 (1972)). "[T]he burden is on defendant to establish that, within the totality of circumstances, the lineup was unnecessarily suggestive and conducive to irreparable mistaken identification." *People v. Saunders,* 220 Ill. App. 3d 647, 665 (1991) (citing *People v. Richardson,* 123 Ill. 2d 322, 348 (1988)).

¶ 237   Defendant argues that he is entitled to an evidentiary hearing on his claim that his lineup was unduly suggestive for two reasons: (1) the detectives told Murray that they had the two offenders that she observed for her to pick out of a lineup; and (2) the officers told Murray " 'that's right' " or " 'good job' " or "words to that effect" after she identified the defendant in the lineup.

¶ 238   However, Murray testified at the evidentiary hearing that the officers did not tell her who to pick out of the lineup and that they did not show her photographs until after she selected defendant from the lineup. Murray unequivocally testified that she observed defendant run through the gangway with a gun shortly after the shooting and that she was not pressured by the detectives to pick defendant out of the lineup. Murray also testified

74

that, although the detectives had told her "that's right or good job" following her selection in the lineup, they had told her that because she was nervous and shaking, and they "said something, nice job, meaning from me facing my fear of picking them out."

¶ 239   As a result, defendant has not made a showing that the lineup was unduly suggestive and we affirm the trial court's dismissal of this claim.

¶ 240                              VII. Cumulative Error Claim

¶ 241   Lastly, defendant argues that, even if each error by itself does not demonstrate the necessary prejudice, the cumulative nature of the errors at trial demonstrate that the trial was "infected by lack of due process," and thus require a new trial in the interest of "fundamental fairness." In support, defendant cites *People v. Jackson*, 205 Ill. 2d 247, 283 (2001), which found that individual errors, even those too small on their own to result in prejudice, "may have the cumulative effect of denying defendant a fair hearing."

¶ 242   We have already found that the trial court erred when it did not advance defendant's evidence of systemic police misconduct to a third-stage evidentiary hearing and we are granting relief accordingly. We do not find error.

¶ 243                              CONCLUSION

¶ 244   For the following reasons, we reverse and remand for the limited purpose of requiring the trial court to conduct a third-stage evidentiary hearing on defendant's coerced confession claim. We affirm the trial court's denial of all other claims.

¶ 245   Affirmed in part, and reversed and remanded in part for a third-stage evidentiary hearing on defendant's claim of the coerced confession.